**UNITED STATES of America**

v.

**JOHNS–MANVILLE CORPORATION.**

Civ. A. No. 31791.

United States District Court
E. D. Pennsylvania.

Sept. 29, 1966.

Raymond K. Carson and Rodney O. Thorson, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

Howard Gittis, Philadelphia, Pa., and Ralph M. Carson, New York City, for defendant.

MEMORANDUM OPINION SUR MO-
TION OF DEFENDANT, JOHNS-
MANVILLE CORPORATION, FOR
SUMMARY JUDGMENT UNDER
RULE 56 (Document 87)

VAN DUSEN, District Judge.

This case is before the court on the motion of Johns-Manville Corporation (hereinafter J–M or defendant) for summary judgment under F.R.Civ.P. 56 (Document 87).

On July 25, 1962, the United States Government filed a Complaint under § 4 of the Sherman Anti-Trust Act (15 U.S.C. § 4) against J–M, Keasbey & Mattison Company (hereinafter K & M) and Certain-teed Products Corporation (hereinafter Certain-teed), seeking injunctive relief against alleged violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). The Complaint alleges that the above-named companies combined and conspired in unreasonable restraint of, and to monopolize, interstate and foreign trade and commerce, and that defendants have attempted to monopolize the aforesaid interstate and foreign trade and commerce in asbestos-cement pipe and couplings (Document 1).

K & M sold its asbestos-cement pipe and coupling business to Certain-teed on or about April 16, 1962 (Document 37, par. 5). On December 22, 1964, this court granted K & M's motion for summary judgment, principally because that company had abandoned its business activity in the asbestos-cement pipe and coupling field and there was a lack of evidence of any probability that it would ever resume it. United States v. Johns-Manville Corporation, 237 F.Supp. 885 (E.D.Pa.1964). Certain-teed's Motion for Summary Judgment was granted on August 10, 1965, principally because there was no evidence showing that that company (which had been in the asbestos-cement pipe and coupling business for only two months before the complaint in this case was filed) had joined in any illegal activities in which J–M and K & M might have been involved. United

States v. Johns-Manville Corporation, 245 F.Supp. 74 (E.D.Pa.1965).

The documents which constitute the record in this case are enumerated in the margin.[1] Rulings on the motions of both parties to strike certain portions of the Gerin and Hogan depositions, plaintiff's motions to strike certain portions of the defendant's affidavits filed in support of the instant Motion, and plaintiff's supplemental motions to strike certain portions of affidavits filed in support of Certainteed's Motion for Summary Judgment are set forth in Appendix A to this opinion.[2]

As noted above, the Government has charged J–M with violation of both §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Under § 1, the Government alleges a two-pronged conspiracy: first, a conspiracy with other domestic producers (chiefly K & M and later Certainteed) to maintain domestic asbestos-cement (hereinafter a–c) pipe prices at a uniform level, and second, a conspiracy among the same companies to keep foreign-made a–c pipe out of the United States market.. The latter aspect of the conspiracy is sudivided into two parts: first, a campaign to promote the adoption by the American Society for Testing Materials (ASTM), the American Water Works Association (AWWA), and municipal authorities of certain restrictive specifications for a–c pipe for the sole purpose of excluding foreign-made pipe, which does not meet such specifications, and, second, miscellaneous concerted activities designed and intended to exclude foreign pipe.

Under § 2 the Government alleges that J–M and co-conspirators have attempted to monopolize interstate and foreign commerce in a–c pipe.

### I. Alleged Conspiracy to Fix Prices

In ruling on the defendants' motion for acquittal in the companion criminal case (United States v. Johns-Manville Corporation, et al., D.C., 231 F.Supp. 690), this court found that there was evidence in the record which would support a jury finding that J–M and K & M agreed on prices during the period 1954–1959.[3] United States v. Johns-Manville

1. The record before the court on the instant Motion for Summary Judgment consists of the plaintiff's Complaint (Document 1), the Answer of defendant J-M (Document 8), plaintiff's statement of contentions (Document 84), defendant J-M's statement of contentions (Document 93), the affidavits filed in connection with K & M's Motion for Summary Judgment (Documents 33, 36, 38, and the three affidavits attached to Document 34), the affidavits filed in connection with Certain-teed's Motion for Summary Judgment (Documents 52–63, 68–70), the affidavits attached to Document 87, except those portions excluded by the rulings in this Memorandum Opinion, including Appendix A, the affidavits filed by the Government as Documents 101–104, 110–113, the affidavit of Roy J. Barloga (attached to Document 114), the depositions taken by the Government (Documents 94–96, 100, 105–109, 121, 126), the affidavit filed by the Government in support of its Motion for stay of discovery proceedings (Document 19), and the transcript of the argument on the Motion for Summary Judgment, insofar as it contains rulings (Document 125). Also, the parties have stipulated that the court may, in disposing of J-M's Motion for Summary Judg-

ment, consider the testimony given at the criminal trial (United States v. Johns-Manville Corporation et al., D.C., 231 F. Supp. 690), exhibits identified under oath at that trial, and GX-3004, which was marked for identification at that trial at N.T. 2658, to the extent that such testimony, exhibits and documents are relevant to this Motion (Document 99).

2. With regard to the Government's motion (Document 114) for reconsideration of the pre-trial order of April 14, 1966 (Document 92) to permit consideration of the affidavit of Roy J. Barloga (attached to Document 114), the court informed counsel at the oral argument of this Motion that this affidavit would be considered on J-M's Motion for Summary Judgment (Document 125, p. 3).

3. Actually the direct evidence of price-fixing activity extends only to the middle of 1958. According to the testimony of the participants, the last meeting between representatives of J-M and K & M to discuss list prices for a-c pipe occurred no later than the summer of 1957 (N. T. 3043–4, 4959–63, 4966–9). The most recent documentary evidence of price-fixing activity is a letter dated in August of 1956 (GX-726). The last telephone con-

Corporation, 231 F.Supp. 690, 696 (E.D. Pa.1964). The record in this case contains no direct evidence of any price-fixing activity since that period.[4] In order to show, as it must in this suit for an injunction, that the defendant is engaged in a presently existing conspiracy to maintain prices on a–c pipe and couplings, the Government relies upon evidence of alleged identical list prices maintained by J–M and K & M up until 1962 and thereafter by J–M and Certain-teed (brief for plaintiff, p. 9). In short, the Government contends that evidence of conspiratorial behavior occurring about four years before the filing of the Complaint and eight or nine years before the filing of the instant Motion for Summary Judgment, plus a continued identity of book prices, establish a continuing conspiracy to fix prices.

■ As to the alleged continued identity of book prices, there is no evidence in this record that J–M and Certain-teed

or any other domestic producer are currently using identical price lists.[5] However, assuming that J–M and Certain-teed are using the same list prices, there is testimony in the record that it was K & M's policy to follow the J–M book prices (Reichel Deposition, p. 93; N.T. 10,-551), and that Certain-teed continued the pricing policy which had been employed by K & M (Reichel Deposition, pp. 66–67). There is also in the record expert testimony that the only practicable course for a small producer like K & M or Certain-teed in an oligopolistic market is to follow the prices of the larger producer (N.T. 11,069–73). It is well settled that evidence of consciously parallel pricing will not alone support a finding of conspiracy under the Sherman Act. United States v. Johns-Manville Corporation, 245 F.Supp. 74, 80 (E.D.Pa.1965), and cases there cited.

Moreover, the defendant has submitted the affidavits of the three J–M officials

---

versation between J-M and K & M representatives to discuss the prices to be bid on specific jobs occurred no later than the middle of 1958 (N. T. 3087).

4. The Government points to GX-511 and GX-546 as evidence that the conspiracy persisted through 1960. GX-546 (which bears the printed date 6/1/60) is an official K & M price list for an area that corresponds with J-M's Atlanta District. GX-511 is a price sheet prepared by W. D. Gibson, the manager of J-M's Atlanta District (N. T. 5379). It is not an official J-M price sheet; rather, it represents a reduction from the then prevailing J-M prices (N. T. 5380). Since GX-511 also bears the date 6/1/60 and since the prices on GX-511 and 546 are identical, the Government contends that these price sheets can only be the result of collusion. However, Mr. Gibson testified that the decision to go off book was made sometime between May 15 and June 1, 1960, and that the actual typing and mailing of the list may have occurred as early as May 20, 1960 (N. T. 5386). Thus, these two price sheets were not necessarily issued simultaneously. Moreover, Mr. Gibson flatly denied that GX-511 was the result of collusion with K & M (N. T. 5382).

The Government argues that the affidavit of William J. Hogan shows that there is a continuing conspiracy between J-M and Certain-teed to fix prices on a-c

pipe. Paragraph 20 of that affidavit is as follows:

"The prices quoted by Johns-Manville and Certain-teed are *about* ten percent higher where imported pipe is not permitted to compete. Following the adoption by Tucson of the testing in the United States requirement, the prices quoted by Johns-Manville and Certain-teed rose to their published list prices. When TUSI began operation of its local testing facility, the prices of domestic pipe dropped to the previous level." (Emphasis supplied.)

Mr. Hogan does not say that J-M's and Certain-teed's prices are the same. Even if they are, his statement is not inconsistent with a pattern of behavior in which Certain-teed raises its prices after J-M has done so. Moreover, the raising and lowering of prices depending on whether there is competition from the generally cheaper foreign pipe would seem to be normal competitive behavior. Although consideration of Mr. Hogan's deposition (Document 126) is not necessary for the above conclusion, it is noted that pages 65–105 of that deposition fully support the above construction of Mr. Hogan's affidavit.

5. This was admitted by Government counsel at the oral argument on this Motion for Summary Judgment (Document 125 at pp. 75–76).

who have responsibility for setting a–c pipe prices (all these affidavits are attached to Document 87). Mr. Orth, who has the final responsibility for approving changes in J–M's list prices for a–c pipe, denies conferring with any competitor on such price changes (Orth affidavit, par. 26). The other two affiants, Mr. Wahl and Mr. Sandt, deny that they ever discussed price changes with any competitor and state affirmatively that they know of no discussions of price changes between J–M employees and the employees of any competitor (Wahl affidavit, par. 6; Sandt affidavit, par. 7). It is noted that such evidence was not in the record at the criminal trial.

The crucial flaw in the Government's price-fixing case, however, is that the record fails to deny or explain the defendant's evidence on transaction prices, i. e., the prices at which sales were actually made as opposed to the official list prices. There is massive and convincing evidence in the record that since 1958, the last year for which there is any direct evidence of meetings between J–M and K & M representatives,[6] J–M has made a considerable portion of its sales at "off-book" prices, i. e., prices which are below those listed in the official J–M price sheets. This evidence demonstrates two things: (1) that there is vigorous price competition among domestic a–c pipe producers, and (2) that it is extremely unlikely that such producers are currently involved in a price-fixing conspiracy.

Whenever a J–M district manager permits his salesmen to sell "off-book," he must submit a form called a price request to the Product Manager. The price request must contain a statement of the reason why the district manager has had to go off book. Several hundred of these price requests were received in evidence at the criminal trial (Exhibits DJM–1001 to 1680). The frequency with which the reason "to meet K & M competition" appears in these price requests leaves little room for doubt that there is effective price competition among domestic a–c pipe producers. The record also contains extensive evidence of price concessions made by K & M to compete with J–M (e. g., Exhibits DKM–61, 63, 76, 77, 77A, 85, 93).

The Government contends that all these sales at off-book prices were the result of prior agreement between J–M and K & M to meet price competition from "others" (Document 84, pars. 14, 16, 18). The only evidence of this in the record is the testimony of Vernon F. Stompler, the former manager of K & M's a–c pipe department, that on several occasions up until 1958 he was a party to telephone conversations in which K & M and J–M officials agreed to quote the same off-book price on particular jobs (N.T. 3029–30, 3084–7, 3155–6, 3159, 3166–9). There is no evidence of collusion on off-book prices since that time. On the other hand, there is substantial evidence of widely varying transaction prices, which could not possibly be the result of a price-fixing conspiracy.

Exhibits introduced at the criminal trial show for the years 1958–1961 the large proportion of total J–M sales made at off-book prices. In 1958, 44.6% of J–M's pressure, sewer and irrigation pipe business was done on the basis of price requests; in 1959 the amount of such business done on the basis of price requests increased to 59.8%. For the years 1960 and 1961, the comparable figures are 50.8% and 55.8%, respectively (Exhibits DJM–401, 400A). Some districts sold off book more frequently than others, and pressure and sewer pipe were sold at off-book prices more frequently than was irrigation pipe. For example, in the New York Sales District in 1960, off-book orders represented 99.2% of total sewer pipe business; in the Denver Sales District in 1959 and 1960, 108.5% and 117.4%, respectively, of total business in pressure pipe was done at off-

---

6. See footnote 3, supra.

book prices [7] (Exhibits DJM–306E, 302, 302E, 410, 412).

The Government has not shown affirmatively that these deviations from list price conform to a consistent pattern. On the contrary, the evidence indicates that the discounts from list price varied erratically from district to district and from transaction to transaction within each district. Pressure pipe figures for the year 1960 show that the average discount on off-book orders in the Philadelphia Sales District was 8.1%, whereas the average discount in such orders in the St. Louis District was 10.8% and in the Seattle District 13.1% (Exhibit DJM–302E). Pressure pipe figures for 1961 show average discounts of 8.6%, 17.1% and 21.3% in those same sales districts, respectively (Exhibit DJM–303F). Exhibit DJM–434, which shows reductions allowed as a percentage of book price in the St. Louis District in 1960, indicates discounts ranging from 1.6 to 14% in the first quarter, from 2.4 to 12.6% in the second quarter, from 4.3% to 22% in the third quarter, and from 4.8% to 15.8% in the fourth quarter. The proportion of J–M pipe sales made at off-book prices has not declined in the years following the criminal trial. Exhibits attached to J–M's Motion for Summary Judgment (Document 87) show that in 1962 71.6% of total water pipe securements was due to price requests, in 1963 70.9% was due to price requests, in 1964 74.7%, and in 1965 67.9%. In 1962 the percentage of total

sewer pipe securements due to price requests was 66.8%, in 1963 it was 61.-9%, in 1964 64.9%, and in 1965 77.3%.

Mr. Clarence Marion, who testified as an expert at the criminal trial, concluded from this erratic price behavior that J–M could not possibly have pre-planned such a pricing policy, let alone conspire with another company on it (N.T. 12,553–5, 12,654–5). He further testified that it was unreasonable to believe that businessmen would agree upon a price level at which they knew they could not sell (N.T. 12,664). It is indeed incredible that J–M and other companies diligently worked out mutually acceptable list prices for a–c pipe and then went out into the field and charged anything but those list prices in order to compete with one another on price.

■ Evidence of conspiratorial behavior occurring eight years ago, plus a continuing identity of book prices, does not create a genuine issue of fact as to the existence of a current price-fixing conspiracy where, as here, the identity of list prices is satisfactorily explained and the actual market situation is shown to be one of vigorous price competition.[8]

■■ The remedy of injunction looks to the future. Douglas v. City of Jeannette, 319 U.S. 157, 165, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Unistrut Corporation v. Power, 280 F.2d 18, 23 (1st Cir. 1960). Its "sole function" in antitrust cases is to forestall future violations. United States v. Oregon State Med. Soc.,

---

7. Percentage figures in excess of 100% are due to the fact that there was frequently a time lag between the report that the order had been secured and the submission of the price request on the order. For example, the report that the order had been secured might be received at J-M headquarters at the end of 1960 and so would be considered a 1960 securement. The price request on that order, however, might not be received until the beginning of 1961 and so would be reflected as a 1961 price request (N. T. 12,349–50). Although this means that the percentage figures given above for particular years are not completely accurate, it can safely be said that during the period 1958–1961

J-M made about half of its a-c pipe sales at off-book prices.

8. There is no merit to the Government's contention that J-M's activities with respect to pipe specifications are probative to show participation in a price-fixing conspiracy. Much of the activity to secure specifications was constitutionally protected under United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and Eastern R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S. Ct. 523, 5 L.Ed.2d 464 (1961). Also, the evidence of actual market activity is contrary to a conclusion that domestic a-c pipe prices were the result of collusion.

343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). The introduction of evidence of vigorous price competition among domestic a–c pipe producers satisfies the defendant's burden of proving abandonment of the price-fixing conspiracy. See United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). As noted above, the only company with which J–M could possibly be shown to have conspired is no longer in the business of selling a–c pipe. It cannot be assumed that Certain-teed or any other domestic producer will enter into a price-fixing conspiracy with J–M at some time in the future when there is no evidence in the record that any of these companies has been a party to such a conspiracy in the past. It is, therefore, concluded that an injunction against price-fixing is unnecessary in this case. See United States v. Johns-Manville Corporation, 237 F.Supp. 885, 890 (D.C. 1964), and cases there cited.

9. The Government also alleges that J-M and K & M engaged in certain predatory price reductions in connection with this phase of the case (brief for plaintiff, p. 30). The situation referred to is the alleged simultaneous issuance of identical price sheets in the Southeastern United States on June 1, 1960. It has been seen above that the Government's evidence on these price sheets fails to show concerted action by J-M and K & M. See note 4, supra.

10. It is noted that the record fails to support the claim that a patent suit without merit was instituted against an importer of Italit a-c pipe in 1960. The United States District Court hearing the case upheld J-M's claim of infringement and the fact that this ruling was reversed by the United States Court of Appeals for the Fifth Circuit does not make the ruling groundless. Although the Government, at page 39 of its brief (Document 133), cited "Feskoe Aff." in support of its argument on this point, this affidavit (Document 63) does not mention patents. The Orth affidavit attached to Document 87 covers some recent discussions concerning patents by J-M, as well as certain agreements on this subject.

11. It is noted that there is no testimony in the record that Mr. Orth specifically threatened the use of Mexican-made a-c

## II. Activities to Limit Foreign Competition Other Than Contentions as to Restrictive Specifications

The Government's next contention is that J–M and K & M conspired to restrict competition from foreign-made a–c pipe in ways other than the promotion of restrictive specifications (Document 84, pars. 39–42). In support of this contention, the plaintiff has introduced evidence of several activities engaged in by J–M which, it is asserted, indicate the existence of this phase of the conspiracy.[9] These are: (1) a series of meetings which took place in various European cities in 1959 and 1960 between representatives of J–M and certain European producers of a–c pipe; (2) the institution of a patent suit against Eternit of Genoa and its American importer, Italit, Inc.;[10] and (3) the use of Mexican-made a–c pipe as a "fighting brand."[11]

The Government does not dispute that the latter two activities were carried

pipe as a "fighting brand." Mr. Gerin stated at page 38 of his deposition (Document 121) that Mr. Orth mentioned "that J-M had bought some interest in Asbestolit [Mexican a-c pipe producer] and would sell Asbestolit in this country," but he did not remember the context in which this statement was made. There was later read to him isolated questions and answers which he had given to a grand jury on February 8, 1962 (p. 91 of Document 121), as follows (p. 103 of Document 121):

"MR. RAYMOND CARSON: That was page 1316.
"Q. At the same page:
" 'Q. Did he say outright that he would fight the European manufacturers with Mexican Pipe?'
"Page 1317:
" 'A. He didn't say with Mexican pipe. He said he would fight us, and later he talked about Mexican pipe, so you could connect the two ideas.'
"Did you so testify?
"A. Yes."
Since plaintiff refused to make the grand jury testimony available to defendant (p. 106 of Document 121), the deposition was concluded without any cross-examination by defendant concerning the above excerpts from the grand jury testimony (pp. 106–7 of Document 121) and such vague grand jury testimony, which has not

on exclusively by J–M. However, the Government contends that J–M initiated them to fulfill a threat made at a meeting in Paris in March of 1960 by J–M Vice President, Robert Orth, who was acting pursuant to a prior agreement with K & M (brief for plaintiff, Document 133, p. 37). There is evidence on the record indicating that Mr. Orth attended the Paris meeting to persuade the Europeans to agree to limit their exports of a–c pipe to the United States to $5,000,000. worth per year and to divide up the American market geographically among themselves (N.T. 7904–6, 7919).[12] There is further evidence that he threatened reprisals if agreement was not reached on these matters (N.T. 7939). There is, however, no evidence from which it could legitimately be concluded that Mr. Orth was acting on behalf of anyone besides J–M. There is testimony that Mr. Colton, Vice President of Johns-Manville International, conversed with Mr. Bateman, managing partner of Turner & Newall, Ltd., which owned all the stock of K & M, for about ten minutes on the evening of the meeting in Brussels in June of 1959 (N.T. 7898–7900), and it is not disputed that Mr. Orth met Mr. Bateman at the London airport after the Paris meeting in 1960 (N.T. 9338–40, 13,343–4).[13] There is no evidence, however, of the contents of the brief discussion between Colton and Bate-

man, and the only evidence of what was said at the Orth-Bateman meeting is Orth's testimony that he told Bateman (his version of)[14] what had transpired at the Paris meeting (N.T. 13,364–5). These brief meetings[15] do not support an inference that Mr. Bateman or Turner & Newall, Ltd., was engaged in a conspiracy with J–M. Moreover, the undersigned has previously ruled that the evidence produced at the criminal trial was insufficient to support the charge that Turner & Newall, Ltd., was a party to the conspiracy alleged in the indictment, Application of Turner and Newall, Ltd., 231 F.Supp. 728 (E.D.Pa.1964), and that there is no evidence of illegal action on the part of Mr. Bateman. United States v. Johns-Manville Corporation, 237 F. Supp. 885, 893, n. 12 (E.D.Pa.1964). Mr. Costa, an officer of Eternit of Genoa, who was present at the European meetings, testified that Orth told the Europeans that "the American manufacturers" were tired of foreign competition and would take all possible measures to protect their market (N.T. 7936, 7939). However, the record contains no evidence that Orth had authority to speak for K & M, which, at that time, was the only other American manufacturer of a–c pipe. Mr. Costa also testified that Orth told the Europeans not to worry about whether K & M would go along with the agree-

been subject to cross-examination, could not be the basis of a finding affecting defendant's rights under these circumstances, particularly when it was taken two days before the hearing on the Motion for Summary Judgment.

12. Mr. Orth denied that he made any such proposals (N. T. 13,273, 13,279, 13,281). His testimony is supported by that of Mr. Gerin of Belgian Eternit, who was also at the meeting (Gerin deposition, pp. 35–42). Mr. Orth testified that, to the contrary, the Europeans were seeking a guarantee of a $5,000,000. American market (N. T. 13,247–9, 13,273, 13,-282).

13. Mr. Orth testified that this meeting was at his request and lasted for about 20 or 30 minutes. Mr. Bateman had just arrived by plane from Majorca (N. T. 13,343–5).

14. See note 12, supra.

15. Mr. Koons' testimony that Orth told him after the Paris meeting that he had been to London to see Mr. Soothill, a director of Turner & Newall, before the Paris meeting is not persuasive since (a) this testimony is inconsistent with Mr. Koons' testimony before the grand jury, wherein he made no mention of a statement by Orth that he had seen Mr. Soothill before the meeting (N. T. 9808–9810), and (b) he had an interest in the outcome of this litigation due to his company's pending treble damage suit (N. T. 9354–7). Mr. Orth denied going to London before the Paris meeting (N. T. 13,285). His testimony, supported by that of Mr. Frazza, is that he flew directly from New York to Paris (N. T. 13,276, 11,740–2).

ment because he (Orth) would go to London to see Turner & Newall on the subject of K & M. Assuming that Mr. Orth did make this statement, it does not indicate that he had any prior agreement with K & M. On the contrary, the statement indicates that if the Europeans agreed on the $5,000,000. quota and the division of United States markets, then Mr. Orth would seek K & M's consent to abide by the arrangement. This evidence does not create a triable issue of fact as to conspiracy when viewed as a whole. The picture it presents is one of unilateral action by J–M. No employee of K & M or Turner & Newall, Ltd. was present at any of the European meetings, and there is absolutely no evidence that either of these companies authorized Mr. Orth to speak for it at the meetings.[16]

Since there is no showing that the alleged miscellaneous activities (enumerated under (1)–(3) above) directed against foreign competition (excluding evidence of acts designed to effect restrictive specifications, which subject is discussed below) were carried on in pursuance of a conspiracy between J–M and some other entity, the Government's case on this aspect of the alleged conspiracy must fail.

■ In any event, the Government concedes that any efforts to obtain agreements to restrict foreign competition have been abandoned (brief for plaintiff, p. 40). Therefore, even if it were established that such efforts were made, an injunction should not issue. United States v. Oregon State Med. Soc., supra.

16. It is noted that when, on the defendants' motion for judgment of acquittal in the criminal case, the undersigned ruled that the jury could find from the above testimony of Mr. Costa and other evidence that the activities at the foreign meetings were carried on pursuant to a conspiracy between J–M and K & M, the defendants had not introduced any evidence. In addition, the record did not at that time contain the affidavits attached to Document 87 or the several depositions that the Government has filed since the criminal trial.

17. It is noted that at the time of this court's first ruling on the relevant market

### III. Asbestos Cement Pipe and Couplings As a Relevant Market

■ In the companion criminal case, the undersigned ruled that there was no evidence in the record from which the jury could conclude beyond a reasonable doubt that a–c pipe constituted a relevant market for purposes of the alleged violation of § 2 of the Sherman Act. United States v. Johns-Manville Corporation, 231 F.Supp. 690, 698–701 (E.D.Pa.1964). After reviewing extensively some of the massive evidence of vigorous competition among the producers of the various kinds of pipe,[17] the undersigned said:

"There is every indication in this record that the above types of pipe were 'reasonably interchangeable' by consumers for the same purposes, except in certain soils such as are present in Southwest Texas. See United States v. E. I. Du Pont, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 * * *. Even in such soils, plastic, tile and concrete pipe were used."

United States v. Johns-Manville Corporation, supra, at 699.

When the relevant market issue was raised again on Certain-teed's motion for summary judgment, the undersigned expressed his belief that the six affidavits added to the record in the interim did not justify a change in his statements on that issue in the criminal case. United States v. Johns-Manville Corporation, 245 F.Supp. 74, 82, n. 9 (E.D.Pa.1965). The scant evidence that the Government.

issue, only the Government's evidence had been introduced, since that ruling was on the defendants' motions for judgment of acquittal. During the presentation of their case, the defendants substantially increased the quantum of evidence showing a highly competitive situation among the various types of pipe. There is a concise review of some of this evidence at pages 110–115 of the defendant's brief. See, especially, the citations to the many price requests in which the reason given by the district manager for going "off-book" is competition from some other kind of pipe.

has added to the record on the question of relevant market since the ruling on Certain-teed's motion for summary judgment does not justify a reversal of the views previously expressed.

The Government's argument based on testimony that ASTM has different specifications and "similar, but not identical" test requirements for each kind of pipe (Cran deposition, Document 107, pp. 12–13) must be rejected. This evidence only indicates a difference in performance characteristics—the same kind of difference that existed among the various types of packaging material involved in the *Du Pont case*, supra, 351 U.S. at 397–398, 76 S.Ct. 994. The Government next refers to testimony that all over the country there are purchasers who prefer one type of pipe over the others and will pay a premium for it[18] (Sandt deposition, Document 109, pp. 44, 47). However, there is no indication as to how many such purchasers exist or what percentage of the pipe market they represent. In the face of the substantial evidence of competition among the producers of the various types of pipe contained in this record, it would be speculation to conclude from this testimony that there is any general pattern among pipe consumers to buy only one type of pipe to the exclusion of the others. The evidence of substantial differences between the prices of a–c and cast iron pipe in this record (Documents 53, 55, 56, 101, 102, 113) is also ineffective to establish a–c pipe as a relevant market. Aside from the fact that cast iron is only one of the many alternative types of pipe available, there was a substantial difference between the price of cellophane and those of other flexible packaging materials in the *Du Pont case*, 351 U.S. at 396, 400–401, 76 S.Ct. 994. In addition, this evidence, as well as evidence that a–c pipe prices have decreased while cast

iron prices have not (Exhibit DJM–435, Document 102), is explained by the fact that in many areas sellers of a–c pipe have to "break into" territories which have traditionally used cast iron pipe (N.T. 11,658; Exhibits DJM–1005, 1027, 1028). The domestic producers must, at the same time, meet competition from the generally cheaper foreign-made a–c pipe (Exhibits DJM–1025, 1029, 1030, 1360, 1370).

The recent decision of the Supreme Court of the United States in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1965), does not require a different result. As in *Du Pont*, the court applied in that case the test of reasonable interchangeability to determine the relevant market. At page 572, 86 S.Ct. at page 1704, the court said "But there is here a single use, i. e., the protection of property, through a central station that receives signals." So in the instant case, there is a single use, i. e., the transportation of liquid through a stationary tubular conduit. Moreover, it is questionable whether that case is apposite at all, since the court is careful to point out at page 572, 86 S.Ct. at page 1704: " * * * we deal with services, not with products * * *."

IV. *Alleged Campaign to Influence Local Officials to Adopt Restrictive Specifications*

The Government alleges that J–M and co-conspirators worked concertedly to bring about the adoption by ASTM, AWWA and local governmental authorities of pipe specifications designed either to increase the cost of selling foreign-made a–c pipe in the United States or to exclude such pipe entirely (Document 84, pars. 26–38). The undersigned remains of the opinion, expressed on several previous occasions,[19] that any concerted activities engaged in by J–M to

18. In his deposition, Mr. Hogan testified that within the Arizona sales territory there were "almost countless" bids where only a-c pipe was involved (Document 126, pp. 112–113). This evidence may show that a-c pipe constitutes a relevant market in Arizona or the southwestern

United States, but it does not show that this is true for the country as a whole. See, also, United States v. Johns-Manville Corporation, 245 F.Supp. 74, 82, n. 9 (E.D.Pa.1965).

19. N. T. 2310, 2553, 8157, 8638, 13,900.

influence the decision of public officials on pipe specifications are constitutionally protected and cannot be the basis of a finding of violation of the antitrust laws, Eastern R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), regardless of the intent with which they were undertaken. United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

Relying on footnote 3 to the *Pennington* opinion,[20] the Government contends that even though J–M's activities with respect to local specifications are lawful in themselves, evidence of such activities may be used to establish anti-competitive intent. The second step in the Government's argument is to assert the proposition that predatory intent can make conduct, otherwise lawful, an unreasonable restraint of trade or an attempt to monopolize. See, e. g., United States v. Columbia Steel Co., 334 U.S. 495, 525, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); United States v. Reading Co., 226 U.S. 324, 370, 33 S.Ct. 90, 57 L.Ed. 243 (1912). On the other hand, not only is it illogical to infer from evidence that J–M engaged in certain completely lawful conduct that it also engaged in other conduct which was unlawful, but it would seem that to draw such an inference in this case would be an infringement upon the defendant's First Amendment rights. Cf. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, L.Ed.2d 480 (1960). It is noted that none of the cases cited by the Government in its Memorandum Regarding Evidence of Predatory Intent To Establish Unlawfulness of Restraint of Trade or by the Supreme Court in footnote 3 of the *Pennington* case involved a situation in which predatory intent was inferred from participation in constitutionally protected activities.

In any event, by the terms of that footnote, it is within the province of the trial judge to exclude such evidence if he finds that it is not probative or is unduly prejudicial. In this case, evidence of activities in promoting specifications to be adopted by state and local governmental units would only be corroborative of other evidence indicating a predatory intent on the part of J–M in advocating the local testing requirement in ASTM and AWWA. On the other hand, allowing the introduction of evidence of these activities would unnecessarily prolong the trial.

V. *Alleged Predatory Promotion in AS TM and AWWA of Specifications on Alkalinity-Uncombined Calcium Hydroxide Tests and on Testing in the United States*

J–M and K & M, through their representatives, promoted the adoption by ASTM and AWWA of: (1) an alkalinity test for a-c pipe (this was later replaced by the uncombined calcium hydroxide or "free lime" test), and (2) a requirement that all a-c pipe installed in the United States be tested in this country. With respect to the former, i. e., the chemical tests, there is substantial evidence in the record that these were scientifically justified. This evidence includes not only the testimony of scientific personnel employed by J–M, K & M and Certain-teed, but also of independent scientists not so employed (N.T. 13,485–6, 11,960–1, 11,976, 11,980 12,023, 12,685–12–694; Cran Deposition, p. 96; Cran Affidavit, par. 4(j)). There is no evidence of a scientific nature which indicates that these tests are not scientifically useful. Nor is there any evidence that J–M proposed the alkalinity and free lime tests for the purpose

20. That footnote reads:

20. That footnote reads:
"3. It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent trans- actions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny." (citations omitted).

of impeding foreign competition. Most of the documents relied on by the Government as support for its allegation that J–M advocated these tests for a predatory purpose were written by K & M personnel. Those documents which were written by J–M employees merely refer to meetings between J–M and K & M research personnel to discuss specifications to be submitted to ASTM and AWWA.[21] These give no indication that J–M's motive in promoting the chemical tests was predatory. John R. Cran, the J–M employee who recommended to ASTM the adoption of the alkalinity and free lime tests, denies that he did so for the purpose of excluding foreign pipe (Cran Affidavit, par. 4(j)). Under these circumstances, the record would not justify the grant of injunctive relief based on the activities of J–M concerning the specifications covering alkalinity and uncombined calcium hydroxide tests.

 With respect to J–M's activities in advocating the adoption by ASTM and AWWA of a requirement that all pipe be tested in the United States, however, there is an issue of fact which must be resolved by a trial. The evidence now on the record on the necessity for this requirement is not as one-sided as in the case of the chemical tests (see the documents referred to on page 21 of the Government's brief—Document 133—but see evidence such as par. 14 of Orth affidavit attached to Document 87). In addition, there is some evidence that in promoting this requirement J–M may have been motivated by a purpose to exclude foreign pipe (N.T. 2613; Exhibit GX–454).

Also, there is no affidavit or deposition specifically denying plaintiff's contentions (Document 84) such as 43.

## VI. *Applicability of F.R.Civ.P. 56*

 The Government argues that with respect to all issues summary judgment is improper in this case, first, because questions of motive or intent are involved, Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and, second, because principles of sound judicial administration preclude granting summary judgment in complex cases, Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); United States v. Bethlehem Steel Corporation, 157 F.Supp. 877 (S.D.N.Y.1958). All of the cases relied on by the Government are distinguishable from the instant one in that in this case the court has had the benefit of an extensive record, including the testimony of witnesses given during a criminal trial lasting over four-and-a-half months. These witnesses were cross-examined, and their demeanor was appraised by the undersigned. Summary judgment is required on this record on the Government's contentions discussed in I–IV above and on the contention discussed in V that defendant's efforts to secure a national specification on the alkalinity-uncombined calcium hydroxide tests justify injunctive relief under 15 U.S.C. § 4. See United States v. Johns-Manville Corporation, 237 F.Supp. 885, 892–893 (E.D.Pa.1964), and cases there cited; Waldron v. Cities Service Co., 361 F.2d 671 (2nd Cir. 1966).

Counsel shall submit within 15 days an appropriate order entering partial summary judgment in accordance with the foregoing so that these contentions (Document 84) are denied:

1, 2, 9–23, 27, 28, 32, 33, 36, 37, 39–42 and 47;

and these contentions are modified as follows:

26, in lieu of the last two sentences the following one will be inserted: "A restrictive provision requiring that all pipe be tested in the United States was agreed upon, drafted and vigorously promoted by representatives of J–M and K & M to and within the

---

21. J-M and K & M representatives on Committee C–17, the a-c pipe specification section of ASTM, were asked by the committee chairman to collaborate on specifications to be submitted to the committee as a whole for approval (N. T. 13,155–6).

appropriate committees of ASTM and AWWA";

31, by deleting the words "the Alkalinity Clause and."

The order shall reflect that the Motion for Summary Judgment is denied as to the following contentions:

3–8, 24, 25, 26 (as modified), 29, 30, 31 (as modified), 34, 35, 38, 43–46.

## APPENDIX A

### TO MEMORANDUM OPINION OF SEPTEMBER 29, 1966, IN CIVIL ACTION NO. 31791

### RULINGS ON VARIOUS OBJECTIONS AND MOTIONS OF BOTH PARTIES

■ On April 14, 1966, this court filed a Pre-Trial Order providing that any material to be added to the record by the Government for purposes of the defendant's Motion for Summary Judgment was to be filed by May 16, 1966 (Document 92, par. I–B). The Government filed the deposition of Jacques Gerin (Document 121) on July 11, 1966, and the deposition of William J. Hogan (Document 126) on August 5, 1966. Rule 56(e) requires that the court's permission be obtained before the record on a summary judgment motion is supplemented by depositions. F.R.Civ.P. 56 (e); United States v. Johns-Manville Corporation, 237 F.Supp. 893 (E.D.Pa. 1965). In the instant case, no reason appears why the Gerin and Hogan depositions should not have been considered in disposing of this Motion for Summary Judgment. Neither party objected to the consideration of these depositions on the ground that they were too late, and it does not appear that either party could be prejudiced by a ruling that they were timely. Accordingly, this court has considered the relevant portions of these depositions in deciding this motion, except where parts of them have been stricken for other reasons.[A]

1. *Ruling on defendant's motion to strike certain testimony of Mr. Gerin (Document 121, pp. 106–7)*

■ At the close of Mr. Gerin's deposition, counsel for defendant moved to strike all of the deponent's testimony occurring after the recess noted at page 90 of the transcript (Document 121, pp. 106–7). Government counsel had used the grand jury minutes from the criminal proceeding to refresh Mr. Gerin's recollection as to conversations he had with Messrs. Orth and Frazza, of J–M. The basis of defendant's motion to strike is that the Government's use of the minutes gave defendant's counsel the right to see them for purposes of cross-examination. Whether, in such a situation, defendant's counsel may inspect the relevant portions of the grand jury minutes is within the discretion of the trial judge. United States v. Consolidated Laundries Corporation, 291 F.2d 563 (2nd Cir. 1961); Continental Baking Company v. United States, 281 F.2d 137 (6th Cir. 1960). See, also, Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). In any event, the trial judge has considered the testimony given by Mr. Gerin after the recess and consideration of all that testimony would not alter the disposition of the motion for summary judgment (see reasons given above at page 16). Defendant is entitled to have this motion granted.

2. *Ruling on plaintiff's motion to strike certain testimony of Mr. Hogan (Document 126, p. 117)*

■ At the close of Mr. Hogan's deposition, Government counsel moved to strike all the cross-examination of the deponent on certain bid tabulations from the City of Tucson (Document 126, p. 117). Defendant's counsel had used the tabulations to impeach statements made by Mr. Hogan in his affidavit (Document 103, par. 20) and his deposition (Document 126, pp. 21–26) that the price behavior of J–M and Certain-teed in the

---

**A.** Footnote 2, supra, refers to a ruling made at the argument on July 7, 1966, concerning the Barloga affidavit.

Tucson area bore a direct relationship to the presence or absence of competition from foreign-made pipe. Government counsel contend that, since defendant's counsel referred to only a few selected bids or official tabulations of bids and did not produce all the bids or records of such bids prepared during the relevant period, the entire cross-examination on this subject must be stricken. This contention is rejected. The possibility that the tabulations used by defendant's counsel in cross-examining Mr. Hogan represent only aberrations in a general pattern of behavior, which conforms to his testimony on direct, may be considered in determining the weight to be accorded this cross-examination. It is noted that there was nothing to prevent plaintiff from producing other bids or records of such bids on re-direct examination or from asking for the deposition to be continued for this purpose.

3. *Rulings on plaintiff's motion to strike the affidavit of John R. Cran (Document 115)*

 The Government's first motion to strike (Document 115) is directed to the affidavit of John R. Cran (attached to Document 87). The Government's motion to strike affiant's statement in paragraph 3 that he will trace the history of the presentation to, and consideration by, ASTM and AWWA of the uncombined-calcium hydroxide test and the testing in the country of installation note is denied. After having served as a research physicist and engineer, Mr. Cran assumed responsibility for J–M's a-c water and sewer pipe specifications in June of 1956. At about the same time, he began to work on the establishment of specifications for a-c pipe by ASTM and AWWA. His duties included representing J–M at various meetings of these agencies and presenting J–M's views concerning specifications. He officially became a member of ASTM Committee C–17, which is responsible for a-c products, in 1959, although he had participated in its meetings prior to that year. His responsibilities in connection with specifications continued until January 1965 (see par. 1 of his affidavit). In the performance of these various duties, Mr. Cran would have become familiar with the history of these specification provisions in the learned societies. However, any statements in the affidavit relating to matters of which Mr. Cran would not have personal knowledge (for example, what transpired at Committee C–17 meetings at which Mr. Cran was not present) will be disregarded. The fact that certain statements of the affiant contained in paragraph 4(a) of his affidavit are in conflict with his deposition (Documents 107, 108) is not grounds for excluding the statements in the affidavit. 6 Moore's Federal Practice, Par. 56.22(1). However, the testimony in the deposition will be treated as more reliable than the statements in the affidavit. Ibid. The Government's motion to strike the statements in paragraph 4(c) that the Department of Justice began putting pressure on ASTM to drop the uncombined calcium hydroxide test is denied, since the existence of pressure from an outside organization would be within the first-hand knowledge of a member of the Committee charged with drafting the test. For the same reason, affiant's statement in paragraph 4(f) that the pressure applied by the Department of Justice increased will not be stricken. However, Mr. Cran's statement in paragraph 4(c) that, as a result of a meeting with the Department in Washington in 1960, ASTM agreed to refer the uncombined calcium hydroxide test back to Committee C–17 for further study will be stricken because there is no showing that affiant had first-hand knowledge of the meeting or that it was the cause of referring the test back to Committee C–17.

 Mr. Cran's statement in paragraph 4(e) that after a meeting of Subcommittee VI of Committee C–17 in December of 1960 a letter ballot was sent out to the Committee as a whole is admissible, since copies of such letter ballot were put in the record at the criminal trial (Exhibit DJM–51).

Mr. Cran's statement in paragraph 4(g) that he had "difficulty in understanding the position of the Department of Justice because, from the information available to us, it was * * based upon * * * the complaints of the foreign producers" will also be stricken. His difficulty in understanding the Department of Justice's position is immaterial to this action and there is no affirmative showing that he is competent to testify to the Department's reasons for its action in advocating the elimination of the uncombined calcium hydroxide test from the ASTM specifications. Affiant's statement in paragraph 4(j) that J–M "has always been of the opinion that there should be a chemical requirement" in the ASTM specifications will be modified by striking out the word "always" and substituting therefor the phrase "since at least 1956," which is the first year Mr. Cran would have had first-hand knowledge of J–M's position on the subject. The Government's motion to strike Mr. Cran's statement in paragraph 4(k) that, "*Each* purchaser determines, on the basis of his own soil and water conditions and safety requirements, the maximum allowable percentage of uncombined calcium hydroxide" (emphasis supplied by the Government) is denied. Mr. Cran is not saying that *every* purchaser takes this action; he is merely testifying to the use to which ASTM specifications are put by a-c pipe purchasers. As a member of the Committee that drafts the specifications and an officer of a corporation which, as a seller of a-c pipe, must of necessity know how buyers select the pipe they will purchase, Mr. Cran is competent to testify as to how, generally, purchasers make use of ASTM specifications. Mr. Cran's statements in paragraph 5(c) that a meeting was held in April 1961 between representatives of ASTM and the Department of Justice, that the Department adopted a certain position at this meeting, and that the Executive Subcommittee of Committee C–17 adopted a revised note as a result of this meeting will be stricken. There is no showing that either Mr. Cran or Subcommittee VI, of which he was a member, had any connection with the events related. The Government's motion to strike Mr. Cran's statement in paragraph 5(d) that the testing in the country of installation note was "scientifically unimpeachable" and his statement in paragraph 5(e) that he has "always believed" that testing in the country was an important safeguard against in-transit damage is denied. Mr. Cran's credentials as an expert in a-c pipe specifications have been referred to above (see, also, paragraph 1 of his affidavit). These statements are competent as the opinion testimony of an expert on the subject. Affiant's statement in paragraph 5(f) that neither he nor his company recommended the testing in the United States note "as part of a conspiracy or an attempt to exclude foreign pipe" will not be considered as a legal conclusion of what amounts to a "part of a conspiracy," but may be considered as his statement of the intent with which he acted for his employer.

Finally, Mr. Cran's statements in paragraphs 6(b), referring to a draft of revised AWWA standards, 6(c) referring to a telegram, 6(e) referring to a letter ballot, and 7(a) referring to an original proposed revision of AWWA's standard, are admissible. To the extent that documents referred to in these paragraphs are not in the record, the weight accorded Mr. Cran's statements will be affected by the defendant's failure to attach copies of such documents to the affidavit.[B]

4. *Rulings on plaintiff's motion to strike the affidavit of Robert F. Orth (Document 116)*

The Government's second motion to strike (Document 116) is directed

B. It is noted that F.R.Civ.P. 56(e) states, inter alia: "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." But cf. Lawson v. American Motorists Insurance Corporation, 217 F.2d 724 (5th Cir. 1954).

to the affidavit of Robert F. Orth (attached to Document 87). Mr. Orth makes statements in paragraph 6 of his affidavit, by which he purports to set forth the substance of two contracts, and in paragraph 10 that technical assistance and patent license agreements similar to those entered into with Flintkote have been offered to and rejected by Certainteed and Capco Company. The fact that a patent licensing agreement has been entered into and that two others have been offered are relevant on the alleged predatory intent with which plaintiff contends J–M has used its patents. On the other hand, the Government is entitled to have the full terms of the contracts (rather than a summary) submitted to it if a fact finder is to base a finding on such terms, so that the court has not considered the description of the contracts as complete or fully accurate.

5. *Rulings on plaintiff's motion to strike the affidavit of George R. Wahl (Document 117)*

 The Government's next motion to strike (Document 117) is directed to the affidavit of George Wahl (attached to Document 87). The Government's motion to strike Mr. Wahl's statement in paragraph 5 that he obtained personal knowledge of all the reasons for changes in certain pipe prices is granted, since Mr. Wahl would not necessarily have had personal knowledge of all the reasons why his superior, Mr. Orth, approved price recommendations which Mr. Wahl submitted to him (see par. 4(a) of Wahl affidavit). These five statements in paragraph 16 with respect to the reasons for certain price changes will be read as prefixed by the phrase "to the best of my knowledge." Pursuant to the Government's suggestion, the statement in paragraph 6, "To the best of my knowledge such changes were the result of completely independent decisions by Johns-Manville without prior consultation or communication of any kind with any of its competitors," will be modified to read that to the best of his knowledge no such communications were had. The Government's motion to strike paragraph

16 of the affidavit, that the reason for certain price changes was competitive pressures since 1958, is denied. Although it appears that affiant's knowledge of such pressures is based on hearsay (see par. 13 of Wahl affidavit and par. 6 of Sandt affidavit), namely, price requests and communications from J–M salesmen and district managers, these sources would be admissible in evidence under the business records exception to the hearsay rule. See 6 Moore's Federal Practice, § 56.22(1).

 Mr. Wahl's statement in paragraph 17 that price reductions were arrived at as a result of studies by the Product Manager and Product Group Manager, who then consulted with Mr. Wahl and submitted their recommendations to him, is a statement of the procedures followed by him so that no hearsay is involved. The absence of such studies and recommendations, if written, as attachments to the affidavit goes to the weight of the allegations but does not preclude their admissibility.

6. *Rulings on plaintiff's motion to strike the affidavit of Hartley Sandt (Document 118)*

 The Government has also moved to strike (Document 118) the affidavit of Hartley Sandt (attached to Document 87). As with the similar statement in the Wahl affidavit, affiant's statement, "To the best of my knowledge such changes were the result of totally independent decisions by Johns-Manville without any prior consultation or communication of any kind with any of its competitors," will be read to say that to the best of his knowledge no such communications were had. The Government's motion to strike affiant's statements in paragraphs 12, 14, 18, 23 and 27, that certain post-1961 price reductions were made as a result of competitive pressure, is denied. Although affiant states that he acquired knowledge of these competitive pressures through price requests and reports submitted to him by J–M district managers and salesmen (see par. 6 of his affidavit), such

price requests and reports would be admissible in evidence under the business records exception to the hearsay rule. See 6 Moore's Federal Practice, § 56.22(1). It is noted that no copies or examples of post-1961 price requests or reports are attached to the affidavit or otherwise contained in the record.[C] Similarly, the statements in paragraph 13 that price reductions were arrived at as a result of studies by the Product and Product Group Managers and recommendations made by them and the General Sales Manager, in paragraph 24 by which Mr. Sandt purports to set forth the contents of documents submitted to J–M by Flintkote pursuant to their patent license agreement, and in paragraph 26 by which he purports to set forth what is "clearly indicated" by reports of J–M salesmen and district managers, are affected by the failure to attach verified copies of any of these documents to the affidavit. The Government's motion to strike that portion of paragraph 26 in which affiant states an estimate of the rate at which Capco is presently securing orders is granted, since no facts are stated upon which such estimate is based and it does not appear affirmatively that affiant would be competent to testify to such estimate on personal knowledge.

**7. *Rulings on plaintiff's supplemental motion to strike the affidavit of Malcolm Meyer (Document 119)***

■ The Government has also filed two supplemental motions to strike affidavits. The first of these (Document 119) is directed to the affidavit of Malcolm Meyer (attached to Document 34). As pointed out above in connection with the affidavit of Mr. Cran, the fact that statements of Mr. Meyer in paragraphs 5 and 10 of his affidavit are in conflict with testimony in his deposition (Document 100) is not grounds for striking the offending statements in the affidavit. The proper procedure is to consider the statements in the affidavit in light of the testimony given at the deposition and, where there is a conflict, to accord greater weight to the latter. 6 Moore's Federal Practice, ¶ 56.22(1). The Government's motion to strike Mr. Meyer's statement in paragraph 7 that instructions contained in a certain directive issued on his orders were followed by all Certain-teed personnel is granted, since testimony of Mr. Meyer at pp. 66–67 of his deposition reveals that this statement was based upon hearsay; namely, information conveyed to Mr. Meyer by Certain-teed's legal department.[D]

**8. *Rulings on plaintiff's motion to strike the affidavit of James R. Reichel (Document 120)***

■ The Government's second supplemental motion to strike (Document 120) is directed to the affidavit of James R. Reichel (attached to Document 34). The Government's motion to strike Mr. Reichel's statement in paragraph 10 that Certain-teed has never proposed specifications to ASTM, AWWA, or local authorities for the purpose of restricting or eliminating competition from foreign-made a-c pipe is denied, since, although Mr. Reichel never attended an ASTM meeting (Reichel deposition, p. 196), he has been in charge of Certain-teed's a-c pipe sales from the date of that company's acquisition of K & M's assets until the present and so would know whether the promotion of restrictive specifications in the learned societies was among his company's arsenal of weapons for

---

**C.** Any statements in the affidavits of Messrs. Sandt and Wahl relating to competitive pressures in the period 1958 through 1961 may be fully considered, since almost 700 J-M price requests (DJM–1001 to 1680) were introduced in evidence at the criminal trial. It is noted that these documents fully support statements that J-M was under heavy pressure from competition during this period.

Since there is no evidence in the record that this competitive pressure subsided after 1961, it may be inferred that it continued beyond that year.

**D.** This testimony was not in the record when this court denied the Government's previous motion to strike this statement. See United States v. Johns-Manville Corporation, 245 F.Supp. 74, 84 (E.D.Pa. 1965).

combatting competition, foreign or otherwise. However, Mr. Reichel's testimony on this subject at his deposition will be given greater weight than the above statement in his affidavit.