UNITED STATES of America

v.

JOHNS–MANVILLE CORPORATION, Keasbey and Mattison Company, and Certain-teed Products Corporation.

Civ. A. No. 31791.

United States District Court
E. D. Pennsylvania.

Dec. 22, 1964.

See also, D.C., 237 F.Supp. 893.

Raymond K. Carson and Rodney O. Thorson, Attys., Anti-Trust Div., Dept. of Justice, for plaintiff.

Thomas D. McBride, Philadelphia, Pa., and Ralph M. Carson, New York City, for Johns-Manville Corp.

Henry T. Reath, Philadelphia, Pa., and Bradley Walls, New York City, for Keasbey & Mattison.

Philip H. Strubing, and John G. Harkins, Jr., Philadelphia, Pa., for Certain-teed Products Corp.

VAN DUSEN, District Judge.

This case is before the court on Keasbey and Mattison Company's (hereinafter sometimes called "defendant") Motion for Summary Judgment under Rule 56 (Document 9).[1]

The present Civil Action, which was filed on July 25, 1962 (Document 1), was brought by the United States Government against three companies: Keasbey and Mattison Company (hereinafter sometimes referred to as "K & M"), Johns-Manville Corporation, and Certain-teed Products Corporation (hereinafter referred to as "Certain-teed"). The Complaint was brought under § 4 of the Sherman Antitrust Act and alleges a conspiracy in violation of §§ 1 and 2 of the Sherman Act. More specifically, the Complaint alleges that defendants combined and conspired in unreasonable restraint of, and to monopolize, interstate and foreign trade and commerce and that defendants have attempted to monopolize the aforesaid interstate and foreign trade and commerce in asbestos-cement pipe and couplings. Injunctive relief is

1. The following constitute the record in this case (Documents 39–41 are not technically part of the record, but indicate the legal positions of the parties):

Document 1—Complaint.

Document 10—Exhibits A and B attached to Certain-teed Products Corporation's Answer, which are admitted by plaintiff as genuine on page 2 of Document 27.

Document 33—Affidavit of Ralph M. Bateman in support of Keasbey and Mattison Company's Motion for Summary Judgment.

Document 34—Affidavits of Malcolm Meyer (President of Certain-teed), of M. S. Davis, Jr. (General Manager of its Pipe Division), and of James Reichel (General Sales Manager of its Pipe Division), attached to Certain-teed's Motion for Summary Judgment.

Document 35—Transcript of argument on Keasbey and Mattison's Motion for Summary Judgment on 9/14/64, pages 53–60 (see footnote 8 below).

Document 36—Affidavit filed by plaintiff in opposition to Keasbey and Mattison's Motion for Summary Judgment.

Document 37—Keasbey & Mattison's Answer to Government's Complaint.

Document 38—Affidavit of Brown (President of Keasbey & Mattison) in support of Keasbey & Mattison's Motion.

Document 39—Keasbey & Mattison's Brief in Support of Its Motion for Summary Judgment.

Document 40—Government's Memorandum in Opposition to Keasbey & Mattison's Motion for Summary Judgment.

Document 41—Reply Brief of Keasbey & Mattison in Support of Its Motion for Summary Judgment.

Document 42—Stipulation between counsel that court may consider on this Motion for Summary Judgment testimony at the criminal trial (No. 21118, United States v. Johns-Manville Corp., et al.), exhibits identified under oath at that trial, and GX–3004, which was marked for identification in said criminal trial at N. T. 2858, so far as such testimony and exhibits are relevant to this Motion.

Wherever "N. T." is used in this opinion, it refers to the transcript of the trial in the above Criminal No. 21118.

sought to restrain a continuation of the alleged offenses.

K & M is a Pennsylvania corporation which, from the year 1936 until June 1, 1962, was engaged in the business of manufacturing, selling and distributing numerous products, including asbestos-cement pipe and couplings (par. 2, Document 33). All of the common stock of K & M is owned by Turner & Newall, Limited, of Manchester, England (hereinafter referred to as "T & N"), through a wholly-owned Canadian subsidiary of T & N (par. 1, Document 33). On or about April 16, 1962, Certain-teed agreed to buy from defendant K & M, pursuant to written agreements, K & M's asbestos-cement pipe and coupling business, including plants, equipment, accounts, records, certain trade-names and patent rights, and other assets employed in connection with the manufacture, sale and distribution of asbestos-cement pipe and couplings (par. 5, Document 37). Also included in the sale was the right to use the K & M name for a period of one year after the closing date in connection with the pipe assets purchased under the agreement (par. 1(g) of Exhibit A attached to Document 10).

In a contract between T & N and Certain-teed, entered into at the same time as the above K & M and Certain-teed contract, it was provided that T & N would not enter into the business of manufacturing or selling asbestos-cement pipe in the United States for a period of five years, except as a supplier of asbestos fibers (par. 4(a) of Exhibit B attached to Document 10).

T & N also agreed with Certain-teed to exchange information as to the methods of manufacturing cement pipe and such exchange shall be effected without payment by either party for the information itself. This is limited by a stipulation that if either party becomes possessed of a "basic development" in the manufacture of asbestos-cement pipe, it need be communicated to the other party only on the possessor's terms. Also, Certain-teed is to purchase, for a period of ten years, from T & N the total quantity of asbestos fibers which Certain-teed requires for the purpose of manufacturing operations itself. This is limited to a 75,000 ton obligation. This is further limited by clauses stating that, if purchase or delivery of the fibers is prohibited by reasons beyond the control of the parties, the defaulting party is excused. The price is to be agreed upon from time to time, and if Certain-teed can buy from another supplier the same quantity and quality at a lower price, it may do so if T & N does not meet the price (par. 4(b) of Exhibit B attached to Document 10).

Certain-teed also agrees that so long as T & N is a holder of not less than either 10% or 250,000 shares of the issued common stock of Certain-teed, it will submit to its stockholders, for election to its Board of Directors, two persons nominated by T & N as nominees of the management.

The sale of K & M assets to Certain-teed was in exchange for 580,000 shares of the latter's stock, which, together with those shares previously owned by T & N, constituted approximately 20% of the issued and outstanding common stock of Certain-teed (Document 36, par. 3). Certain-teed in this transaction, in addition to physical assets, also acquired some of K & M's key personnel and office space in order to continue the operation of the business (par. 5, Document 37).

The sale or liquidation of K & M was discussed as early as 1959 by the Board of Directors of T & N (par. 4(a), Document 33). The discussions of sale were prompted by T & N's concern over the difficulties of absentee management. In time sequence, the above discussions follows a 1958 Grand Jury inquiry in which several officials from K & M were called to testify (see p. 71, Document 35, and footnote 12 below).

In the spring of 1961, there were tentative negotiations with another party, other than Certain-teed, on the possibility of sale. These never materialized, so that in December of 1961, Mr. Bateman, Deputy Director of T & N and a member of the Board of Directors of K & M, met

with individuals representing Certain-teed to negotiate the sale of K & M's asbestos-cement pipe and coupling business and this meeting led up to the ultimate agreement of April 1962 (par. 4(b), (c) & (d) of Document 33). Nowhere on the record is there any evidence that this sale was made as a result of any Government criminal proceedings. In fact, the record shows the opposite:

"3. Said sale was not made as a result of the criminal indictment of K & M on June 1, 1962 for alleged violations of the Sherman Antitrust Act; nor was it the design or intent of Turner & Newall or K & M to sell its pipe business, liquidate, and dissolve, to avoid prosecution or litigation in connection with the said indictment or any other litigation related to the said business.

"4. As is set forth in more detail in the subparagraphs below, the negotiations and contractual arrangements for the sale of the asbestos-cement pipe business were undertaken and consummated long before either the criminal litigation or the present civil equity action. The decision to sell the pipe business was dictated by valid and bona fide business reasons. * * *" (Affidavit of Ralph M. Bateman, Document 33)

On May 4, 1962, the stockholders of K & M approved and ratified a resolution of the Board of Directors of K & M providing for a plan of liquidation of the company within a 12-month period (par. 4 of affidavit attached to Document 9). Settlement to carry out the agreement of April 1962 was held June 1, 1962, and this settlement date was designated well in advance of said date, without any knowledge of the criminal indictment that was handed down on the same day (par. 4(e), Document 33).

On June 1, 1962, the defendants were indicted in a companion criminal case for purported violations of the Sherman Act. The indictment was based on substantially the same conduct alleged in this suit, although the indictment did not include Certain-teed, a defendant in the instant action. After trial to a jury, the defendants were acquitted.

Defendant K & M filed its Motion for Summary Judgment on September 14, 1962 (Document 9), and on December 19, 1962, and June 3, 1963, entered into stipulations with the plaintiff for a stay of further proceedings on its Motion until the criminal proceedings were disposed of or until such time as either party reordered the Motion on the argument list, or until further order of the court (Documents 13 and 28).

After oral argument on September 14, 1964, on the Motion for Summary Judgment, the defendant K & M filed an Answer to the Government's Complaint on October 19, 1964 (Document 37), denying the allegations of any past illegal conduct.

The assets of K & M, other than those pertaining to the pipe business, were sold to four corporations other than Certain-teed (par. 3, Document 38).

On December 11, 1962, K & M filed a Certificate of Election to Dissolve with the Secretary of the Commonwealth of Pennsylvania. On or before March 31, 1963, all of the assets of K & M (including the shares of Certain-teed) were distributed to its sole stockholder (the Canadian subsidiary of T & N) in liquidation (par. 6, Document 33). K & M has withdrawn its certificate to do business in all of the states of the United States and is presently awaiting final tax clearance from the Commonwealth of Pennsylvania. This is expected to be attained by April 30, 1965 (Document 38, par. 5). K & M does not intend ever to go back into the asbestos-cement pipe business (pars. 7 and 8, Document 33).

Certain-teed was not engaged in the manufacture or sale of asbestos-cement pipe prior to June 1, 1962 (par. 4 of Affidavit of M. Meyer, attached to Document 34).

The President of Certain-teed stated that the issuance of Certain-teed stock to K & M was used as a medium for the sale because it conserved Certain-teed's cash resources. Further, he states that

the block of Certain-teed owned by the Canadian subsidiary of T & N does not give it control of Certain-teed, de facto or otherwise (par. 13 of affidavit of M. Meyer, attached to Document 34).

Although T & N has the right to have management nominate two directors for election to Certain-teed's Board, under Certain-teed's By Laws the number of Directors of Certain-teed may not be less than seven nor more than 15. Thus, these two Directors will have to be a minority (par. 14 of affidavit of M. Meyer, attached to Document 34).[2]

The principal evidence in the criminal trial justifying any finding of violations of the antitrust laws concerned events prior to the spring of 1957. Even assuming such violations could be established by the weight or fair preponderance of the evidence, there is no showing that they continued during the five-year period from June 1, 1957, to June 1, 1962.

After Mr. Porter became President of K & M in April 1957, he created a new management team for the company, increasing expenditures for advertising, research and new buildings. An aggressive policy of securing sales through service to customers was adopted. In order to give better service, the market strategy followed the use of independent, local distributors, which strategy was not adopted by Johns-Manville. The policy of following the price leadership of Johns-Manville was pursued.[3]

None of the principal officers of K & M during the period from the spring of

1957 to April 1962 are now employed by Certain-teed, except for Mr. Reichel.[4] As shown on GX–102, the controlling officials of the K & M asbestos-cement pipe business in 1957 were Mr. Porter, President, Mr. Widmayer, Vice President and Director of Sales, who retired more than a year before the agreement of sale dated April 1962, and Mr. Barr, General Manager of the asbestos-cement pipe department. None of these officials has ever worked for Certain-teed Products Corporation.[5] As to Mr. Reichel, he became the Sales Manager of the K & M Pipe Division on January 1, 1959. He has been a Vice President with Certain-teed since January 1, 1963, although he was not employed by Certain-teed from February 1963 for three months, until May 1963, when he returned at Certain-teed's request. He was not connected with the asbestos-cement pipe business during this period of absence.

There is no evidence that present Certain-teed employees such as Mills and Williams, who had been non-policy making employees of K & M, had any part in the alleged illegal policies which the Government contended K & M instituted prior to April 1957,[6] and the Government argues a fact finder should infer continued after that date in spite of the change of management which took place in April 1957.

From the foregoing summary of the facts, it can be seen that K & M made its contractually binding plans to sell its asbestos-cement pipe business one and one-half months before the criminal in-

2. Paragraph 14 of the affidavit of M. Meyer dated September 11, 1964, states that neither of the two Directors named by T & N has ever attended a meeting of the Board of Directors of Certain-teed.

3. The necessity of following the price leadership of its large dominant competitor, Johns-Manville, was explained by an economic expert (Mr. Brink, N. T. 11057–11099), who was employed by K & M to advise it.

4. Mr. Nagle, as manager of the tubular products and sewer pipe sub-division of the asbestos-cement pipe department (see GX–102), was not a policy-making

official of the department (N. T. 11,318–9). There is a large quantity of testimony that Mr. Stompler, who held a co-ordinate position (see GX–102), had no policy making functions in the fall of 1957 (see, also, N. T. 11,328 and 11,364–5).

5. Mr. Stompler and Mr. Mettetal (N. T. 10,415–10,432) never worked for Certain-teed.

6. Mr. Mills, N. T. 11,266–11,271, 11,284 and 11,287; Mr. Williams, N. T. 5306–5313, 5324, 5325, 11,578–11,597. See, also, last paragraph of footnote 12, page 18.

dictment was filed and over three months before this civil suit was filed.

■ At page 5 of its Memorandum in Opposition to Defendant's Motion for Summary Judgment (Document 40), the Government states that it agrees "with the abstract proposition that the total abandonment of unlawful practices, together with a showing of no reasonable probability or expectation of resumption or continuation may make it unnecessary for a court of equity to issue an injunction." This proposition is supported by the cases. See United States v. W. T. Grant, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); United States v. U. S. Steel, 251 U. S. 417, 445, 40 S.Ct. 293, 64 L.Ed. 343 (1919); United States v. William S. Gray & Co., 59 F.Supp. 665, 666 (S.D.N.Y.1945); United States v. Aluminum Co. of America, 44 F.Supp. 97, 215 (S.D.N.Y.1941). Cf. Standard Oil Company v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926 (1931).

■ The Government contends the burden on the movant is a heavy one to show that there has been a complete abandonment and a lack of reasonable probability of resumption. For this proposition, the Government cites United States v. W. T. Grant, supra, and United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952). In both of these cases, there was no question that the defendants had been violating the antitrust laws before suit was brought. Thus, they are distinguishable from the instant case on their facts, since here the defendant has been found in a criminal trial not guilty of any violation of the antitrust laws. Taking first the issue of abandonment of the unlawful practices, the defendant has been found innocent of ever participating in the unlawful practices in a four and one-half month criminal trial. Further, defendant sold its business some three months before the instant Complaint was issued. It is now a corporate shell which has had no assets since March 31, 1963, and only the final step of tax clearance from the state remains between it and complete dissolution. This record meets the burden necessary to show complete abandonment.

As to the issue of reasonable probability of resumption, the Supreme Court, in United States v. W. T. Grant, supra, 345 U.S. at page 633, 73 S.Ct. at page 898, said:

"* * * the moving party must satisfy the court that relief is needed. * * * that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."

The Government has pointed to nothing in the instant record other than the mere possibility that K & M might be rejuvenated by T & N or that Certain-teed Products might be dominated by K & M and influenced by it to violate the antitrust law. As to the latter contention, the Government states that T & N owned 100% of K & M and it now owns, through a subsidiary, 20% of Certain-teed. The Government contends that this 20% ownership in Certain-teed gives T & N the same amount of domination and influence of the asbestos-cement pipe business that it had before the sale, especially, it alleges, in view of the fact that many of the key employees were retained after the transfer.[7]

The record does not justify assigning the significance to the ownership by a

---

7. GX–3004 (attached to Document 42) lists the employees who were with K & M and who remained with the asbestos-cement business after its sale to Certain-teed. With the exception of Mr. Reichel, who has already been mentioned in the opinion (see page 9), none of these employees who testified at the trial (Criminal No. 21118) were policy-making employees with K & M (Mr. Mashburn, N. T. 296, 312; Mr. Prechek, N. T. 750–753; Mr. Conner, N. T. 807; Mr. Clubb, N. T. 1007–1010, 1034; Mr. Outlaw, N. T. 5505, 5506, 5552, 5553, 5610, 5611; Mr. Lassone, N. T. 8132, 8133; Mr. Fairbanks, N. T. 12,789, 12,807, 12,808; as to Mr. Nagel, see footnote 4 above and as to Mr. Mills and Mr. Williams, see footnote 6).

subsidiary of T & N of 20% of the stock of Certain-teed that the Government does. Nowhere on the record is there any indication that T & N has dominated or influenced Certain-teed in the operation of its asbestos-cement pipe business through its ownership of stock or that it will dominate Certain-teed in such operation in the future. The Government apparently wishes the court to assume that T & N's beneficial ownership of 20% of Certain-teed's stock gives it control.[8] The Government, during oral argument, cited United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), in support of its argument that a 20% interest is a significant feature. The Supreme Court held in duPont that the duPont Company's acquisition of 23% of the stock of General Motors from 1917 to 1919 was an acquisition whose effect, viewed at the time of suit, might substantially lessen competition in the line of commerce consisting of automotive finishes and fabrics. This decision was based on a great many facts which the court gathered from the record, such as that the Flint Varnish and Chemical Works, a competitor in auto finishes, in 1918 came and asked to be bought out by duPont because it realized it had lost a valuable customer in General Motors, and the fact that Fisher Body, who had resisted duPont sales pressure for many years, gave up this resistance in 1948. The instant record contains no facts which evidence any control of Certain-teed exercised by T & N through its subsidiary's stock ownership. This is one distinction from the duPont case. Secondly, the question answered in duPont was whether or not there was a violation of § 7 of the Clayton Act, i. e., was duPont's acquisition of General Motors' stock one which might tend to create a monopoly of a line of commerce. The Government is citing the duPont case for the proposition that 20% ownership of Certain-teed's stock by the Canadian subsidiary of T & N gives T & N substantially the same control over Certain-teed that it had over K & M when it owned 100% of K & M's stock, whereas the issues and facts in the duPont case are not similar to those presented by this record concerning the ownership by T & N's subsidiary of 20% of the stock of Certain-teed.

It is noted that the managing officials of the asbestos-cement pipe business since it was transferred to Certain-teed have been the latter's personnel and not those acquired by Certain-teed in the purchase from K & M. During the initial period after the acquisition, the sale of asbestos-cement pipe was largely under the direct supervision of Malcolm Meyer, the President of Certain-teed. Then responsibility for the sales activities was placed under K. A. McCaskill, an employee of Certain-teed since 1950. On May 1, 1963, a separate division was established for the manufacture and sale of asbestos-cement pipe, and M. S. Davis, an employee of Certain-teed since 1957, was appointed as the head of the division (par. 8 of affidavit of M. Meyer, attached to Document 34).

Under these circumstances, there is not enough evidence to persuade a court to believe that there exists sufficient cognizable danger of recurrent violation.

The Government cites United States v. Standard Ultramarine Color Co., 137 F. Supp. 167 (S.D.N.Y.1955), for the proposition that private litigants must not be deprived of the benefit of prima facie showing of liability in their private actions. Congress, through § 5 of the Clayton Act, has bestowed this right upon private litigants. Although Congress has declared a public policy in favor of aiding private antitrust litigants, the Government has had one day in court already in an attempt to vindicate this

---

8. At the oral argument on the instant motion, the trial judge urged the Government to get on the record the significance of owning 20% of the stock of a corporation such as Certain-teed (see pages 53–60 of Document 35), but the Government has failed to supplement the record on this point.

public interest when it tried the criminal trial.[9]

■ In United States v. William S. Gray & Co., supra, the defendant was charged with a conspiracy and combination in restraint of trade. The Government brought both a civil and a criminal action. The defendant moved for a summary judgment in the civil action. The company had dissolved completely by the time the case was decided. The court granted the defendant's motion, finding no reasonable anticipation of a wrongful act in the future, and on the point of vindication of the public interest said, 59 F.Supp. at page 667:

"* * * it does not seem to me that these defendants should be subjected to the burden of a long and expensive trial when the basis for the relief demanded in the complaint no longer exists and the sole purpose is an ulterior one. Moreover, a final judgment in the criminal action now pending * * * would be equally effective under Section 16."

Applying the reasoning of the Gray case to the instant facts, the Government is not entitled to another day in court to vindicate the public interest.

The Government attempts to distinguish the Gray case from the instant one by saying that "Certain-teed is a successor to K & M in the conduct of its asbestos-cement pipe and couplings business as such."[10] There was no successor to the dissolved corporation in Gray. In the instant case, the Government states "that K & M has not been dissolved, that the sale of its assets was a change in form rather than substance."[11] The Government attempts to support its contention that Certain-teed is a corporate successor by an affidavit showing that T & N beneficially owns about 20% of the stock of Certain-teed. This, plus the

fact that Certain-teed acquired some of the key personnel of K & M in the transfer of the business, makes up the basis of the Government's argument that Certain-teed is a corporate successor to K & M in the pipe business. In view of the fact that neither the President of K & M nor its principal officers were employed by Certain-teed and the circumstances pointed out at pages 8–10 and 13–14 above, this record would not justify a finding that Certain-teed was a corporate successor to K & M and under the control of T & N.

■ The amendment to F.R.Civ.P. 56 (e), which has been in effect since July 1963, reads:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

The record, when read under the provisions of this rule, does not support the Government's charges that the sale of the asbestos-cement pipe assets of K & M was done to avoid the anti-trust laws, that the sale of assets was a change in form rather than substance, and that neither K & M nor its parent, T & N, has abandoned the offensive conduct of which it is accused. The decisions of the United States Court of Appeals for the Third Circuit, holding that summary judgment is appropriate where uncontradicted affidavits and sworn testimony are submitted in negation of the generally pleaded conspiracy claim, are applicable. Gold Fuel Service, Inc. v. Esso Standard Oil

---

9. The trial judge suggested that the Government try the civil case, rather than the criminal case, in January 1964, but it elected to proceed with the criminal trial, involving a heavy burden of proof.

10. Page 9 of Government's Memorandum in Opposition to Motion by Defendant

Keasbey & Mattison Company for Summary Judgment under Rule 56 (Document 40).

11. Page 4 of Government's Memorandum (Document 40).

Co., 306 F.2d 61 (3rd Cir. 1962); Fiumara v. Texaco, Inc., 204 F.Supp. 544 (E.D.Pa.1962), aff'd 310 F.2d 737 (3rd Cir. 1962); cf. Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199 (3rd Cir. 1961), cert. den. 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962).

The condemnation of trial by affidavit in cases such as Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962), construed in the light of the subsequent amendment to Rule 56(e), is inapplicable to the instant case, where the Government relies chiefly on the allegations in its pleadings. The instant case is also distinguishable from Poller in that the record consists of testimony given by witnesses, during a criminal trial lasting over four months, who were subject to cross-examination and who had their demeanor appraised by the undersigned.

Looking at the record in this case in the light most favorable to the plaintiff, as must be done, it shows no genuine dispute as to a material fact. As pointed out in the able Reply Brief of defendant (Document 41), at pages 18 ff., the cases relied on by the Government are inapplicable to the facts in this record, particularly because the abandonment of business activity in those cases took place after its legality had been challenged by the Government, whereas

the asbestos-cement pipe and coupling business of defendant was sold in April 1962, before the indictment against this defendant was returned and this civil action was instituted.[12]

Defendant's Motion for Summary Judgment will be granted.

12. As pointed out in Memorandum Opinion Sur Motion to Quash Subpoena Duces Tecum, dated March 12, 1962, in In re Grand Jury Investigation, Document 1 of Misc. No. 2372, K & M has been subjected to Government searches, examinations of its files, and questioning with regard to possible antitrust violations in the asbestos-cement pipe industry since the fall of 1956. Subpoenas were issued dated March 17, 1958, August 1, 1958, June 13, 1961, and January 23, 1962, requesting the production of documents from K & M. At least eight employees of K & M testified before grand juries in April of 1958 [this Grand Jury was impaneled in May 1957, as shown in affidavit of Lindsay in In the Matter of Grand Jury Subpoenas, Turner & Newall, Limited, Document 4 of Misc. No. 2005]

and May of 1959. In light of the continuing investigations by the Government and the two grand jury proceedings prior to the one which handed down the indictment on June 1, 1962, K & M had no reason to suppose, in the winter and spring of 1962, that the current grand jury would return an indictment. For this reason, the record would not justify the drawing of an inference that K & M sold its asbestos-cement pipe business in April 1962 to avoid prosecution under the antitrust laws.

Also, it is noted that there is no evidence that Mr. Soothill or Mr. Bateman had direct policy-making contacts with K & M on more than an annual basis, when trips would be made to this country. There is no evidence of illegal action by these English citizens.