**UNITED STATES of America**

v.

**NICOLET, INC., et al.**

**Civ. A. No. 85–3060.**

United States District Court,
E.D. Pennsylvania.

May 10, 1989.

David Street, Trial Atty., Dept. of Justice, Washington, D.C., Susan Dein Bricklin, Asst. U.S. Atty., Dept. of Justice, Philadelphia, Pa., for plaintiff.

Jon S. Brooks, New York City, for T & N.

Joel Schneider, Philadelphia, Pa., for Nicolet, Inc.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff United States, at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), on May 30, 1985, filed suit against defendant Nicolet, Inc. ("Nicolet"). In its original Complaint, the United States alleged that Nicolet was liable, pursuant to § 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a), for costs incurred by EPA in responding to a release or threatened release of a hazardous substance at a waste disposal site in Ambler, Pennsylvania ("Ambler Site"). The United States sought the following relief: a judgment that Nicolet was liable for costs already incurred by EPA; a declaratory judgment that Nicolet is liable for all future costs (not inconsistent with the National Contingency Plan) to be incurred by EPA in connection with the Ambler site; interest; and litigation costs.

On March 13, 1986, Nicolet filed a third-party Complaint against T & N plc ("T & N") (formerly known as Turner & Newall PLC), alleging that T & N was liable for the response costs and/or was liable for contribution or indemnity to Nicolet for such costs as a consequence of T & N's relationship to the previous owner of the Ambler site. The United States, on February 4, 1987, moved to amend its Complaint to add T & N as a defendant. The motion to amend was granted on May 28, 1987, and the United States filed and served its First Amended Complaint on June 5, 1987.

On July 17, 1987, Nicolet filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101 et seq., in the Bankruptcy Court for the Eastern District of Pennsylvania. Accordingly, pursuant to Section 362(a) of the Bankruptcy Code, this Court, on September 1, 1987, issued an Order placing the action in the Civil Suspense File. On January 12, 1988, this Court granted the United States' Motion for Declaration of Inapplicability of Automatic Stay, removed the case from civil suspense, and established a briefing and discovery schedule. *United States v. Nicolet, Inc.*, 81 B.R. 310 (E.D.Pa.1988), *affirmed,* 857 F.2d 202 (3d Cir.1988). Defendant Nicolet and the United States have executed a settlement of all claims. The United States has submitted the settlement to the Department of Justice for review and public notice and comment. Upon completion of the review process, it is anticipated that the settlement will be submitted to this Court for final approval.

On February 22, 1988, T & N moved to dismiss the United States' First Amended Complaint. The United States filed Plaintiff's Response to Defendant T & N's Motion to Dismiss on March 9, 1988, and a Supplemental Memorandum in Opposition to the Motion to Dismiss on April 28, 1988. Defendant T & N filed Reply Memoranda on April 6, 1988, June 23, 1988, and April 18, 1989. In addition, on November 23, 1988, the United States filed its Second Motion for Leave to Amend the Complaint, which motion T & N opposed on December 15, 1988. Based upon a request by the parties, this Court deferred ruling on both the Motion to Dismiss and the Second Motion to Amend pending disposition of the ongoing settlement negotiations between the United States and T & N. However, because the parties have recently informed the Court that they have been unable to reach a settlement, the Court will proceed to determine both motions.

## I. Factual Background

From approximately 1873 to September 1962, Keasbey & Mattison Company ("Keasbey"), a Pennsylvania company founded in 1873, incorporated in 1892, and dissolved in 1967, owned and operated a manufacturing facility and two adjoining waste disposal sites in Ambler, Montgomery County, Pennsylvania. In 1934, T & N, a company organized in 1920 and operated under the laws of England, purchased a majority interest (60%) of stock in Keasbey. Four years later later, in 1938, T & N purchased the remaining shares of Keasbey and maintained 100% ownership of the company until its dissolution in 1967. From November 8, 1951 through 1967, the record owner of Keasbey's stock was Turner & Newall (Overseas), Ltd. ("T & N(O)"). In 1962, Nicolet purchased the manufacturing facility and adjoining waste disposal piles and has owned the site from that date to the present.

As a result of sampling programs conducted pursuant to § 9604 of CERCLA in 1983, EPA determined that there was a release or threatened release of asbestos, a dangerous substance, at the Ambler site. On March 14, 1984, Nicolet was informed by EPA that its contractors would perform the allegedly necessary abatement. Following a protracted legal battle, EPA was granted entry to the Ambler site and performed the allegedly necessary abatement. *See Nicolet, Inc. v. Eichler*, Civ. Action No. 84–0271 (E.D.Pa. March 26, 1984). The United States, among other measures, covered over and hydroseeded a 16 acre "mountain" of asbestos containing material. Subsequently, the United States, pursuant to Section 116(d) of CERCLA, 42 U.S.C. § 9616(d), conducted a remedial investigation/feasibility study for the site, and published a Record of Decision for the site on September 30, 1988. The United States alleges that it has incurred, through its actions, at least $2,500,000 in "response costs" as defined at 42 U.S.C. § 9601(25), which figure includes the costs of "removal" as defined at 42 U.S.C. § 9601(23), and enforcement costs.

## II. United States' Theories of Liability As to Defendant T & N

In the First Amended Complaint, the United States advances the following four theories in support of its allegation that defendant T & N is liable for the costs incurred at the Ambler site to abate the release of threatened release of asbestos:

1. Defendant T & N is liable, under a federal rule of decision for CERCLA cases, as the alter ego of Keasbey in that T & N had both a substantial ownership interest and exercised substantial involvement in Keasbey, a corporation potentially liable under CERCLA. *First Amended Complaint*, ¶¶ 10, 19, 20.

2. Defendant T & N is liable, under Pennsylvania law, as the alter ego of Keasbey in that Keasbey's policies, business practices, and finances were dominated by T & N and the corporate entity of Keasbey was used to defeat public convenience, protect fraud or defend crime. *First Amended Complaint*, ¶¶ 23, 24, 25, 25.

3. Defendant T & N is directly liable under Section 107(a)(2) of CERCLA, as a former owner and operator of the Ambler site, because T & N was the sole

stockholder of Keasbey and actively participated in its management while asbestos was being disposed of at the Ambler site. *First Amended Complaint,* ¶¶ 19, 20, 27.

4. Defendant T & N is directly liable under Section 107(a)(2) of CERCLA, as a former owner and operator of the Ambler site, because T & N, as the parent corporation of its subsidiary, Keasbey, was familiar with Keasbey's waste disposal practices and had the capacity to abate environmental harm resulting from such activities. *First Amended Complaint,* ¶¶ 19, 21, 22, 27.

In addition, the United States, in its proposed Second Amended Complaint, advances a fifth theory of liability:

5. Defendant T & N is directly liable under Section 107(a)(2) of CERCLA, as a former owner and operator of the Ambler site, in that T & N both held a mortgage (an indicia of ownership under Pennsylvania law) on the Ambler site which it assigned to T & N(O), the alter ego or instrumentality of T & N, and actively participated in the management of the Ambler facility. *Second Amended Complaint,* ¶¶ 30, 31, 32, 33, 34, and 42.

In addition, the United States seeks, in the Second Amended Complaint, to: plead an expanded time frame for T & N's alleged liability (based upon facts revealed during discovery); correct certain inaccuracies in the First Amended Complaint; describe more clearly the theories of liability set forth in the First Amended Complaint; and to update the history, status, and cost of the EPA environmental response with respect to the Ambler site. Paragraphs 41–47 of the proposed Second Amended Complaint set out the theories of liability against T & N alleged by the United States. With the exception of paragraph 42 (indicia of ownership), each of the paragraphs are refinements or modifications of the theories of liability initially set forth in the First Amended Complaint.

Defendant T & N opposes this Court granting the United States leave to file a Second Amended Complaint, alleging both undue delay and bad faith on the part of the United States in seeking to amend and prejudice to T & N if such amendment was allowed. In addition, T & N has moved to dismiss the First Amended Complaint on the ground that the United States has failed to allege facts in the First Amended Complaint sufficient to make T & N liable under any of the first four theories of liability. Finally, defendant T & N argues that the United States has failed to allege facts in the Second Amended Complaint sufficient to make T & N liable under the fifth theory of liability.

### III. United States' Motion for Leave to File Second Amended Complaint

It is well established that while the granting of a motion to amend a complaint is within the sound discretion of the district court, *Lewis v. Curtis,* 671 F.2d 779, 783 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), the general rule is that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984). Indeed, the Supreme Court has directed that leave to amend should be freely given:

[i]n the absence of any apparent or declared reason—such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment ...

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

As the Third Circuit has held, "[d]elay alone, however, is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party." *Cornell & Co., Inc. v. Occupational Safety and Health Review Commission,* 573 F.2d 820, 823 (3d Cir.1978). Rather, "the touchstone is whether the non-moving party will be prejudiced if the amendment is

allowed." *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d at 1212. Thus, the Third Circuit, in *Adams v. Gould, Inc.*, has provided the framework within which a district court addresses a motion for leave to amend a Complaint:

> The passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party. The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiffs' motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants.

739 F.2d 858, 868 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985); *see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 613–14 (3d Cir.1987).

While we have, in the past, expressed our concern that the parties have failed to litigate this matter in an expeditious and efficient manner, a concern we today reiterate, we conclude that there was neither undue delay, bad faith, or dilatory motive in the United States seeking leave to file a second amended complaint. We note that in the approximately one year since T & N was named, in the First Amended Complaint, as a defendant, the parties have engaged in extensive, protracted, and often contentious discovery on both sides of the Atlantic Ocean. Accordingly, the United States' present motion which is the first proposed amendment adding to or modifying its theories of liability against defendant T & N, is both reasonable and far superior to piecemeal amendments to its pleadings. Moreover, the proposed Second Amended Complaint is based exclusively upon either alleged facts discovered during the formal discovery period or subsequent significant events affecting the litigation (such as the United States' preparation of the remedial investigation/feasibility study).

More importantly, we conclude that defendant T & N will not be prejudiced by the proposed Second Amended Complaint. We note not only that many of the allegations advanced by the United States in its proposed amended pleading, were derived from documents within T & N's possession but also that most of the allegations and alleged facts in support thereof have been previously identified in the United States' Second Supplemental Response to Defendant Turner & Newall's First Set of Interrogatories and Accompanying Requests for Production. Accordingly, we reject as disingenuous, T & N's characterization of the proposed Second Amended Complaint as an "attempt ... to change the rules long after the game has started." Indeed, T & N has failed to demonstrate how the filing of the Second Amended Complaint will interfere with its ability to be ready for the commencement of the trial scheduled for June 5, 1989.

In point of fact, even the "new" fifth theory of liability alleged in the Second Amended Complaint does not introduce a wholly new cause of action but, rather, provides an additional variant of the United States' basic allegation that T & N falls within the ambit of a person potentially liable under Section 107(a)(2) of CERCLA as a former owner or operator of the Ambler site. As was recognized by a former member of this Court:

> As long as a plaintiff adheres to a legal duty breached or an injury originally declared on, an alteration of the modes in which defendant has breached the legal duty or caused the injury is not an introduction of a new cause of action. The true test is whether the proposed amendment is a different matter or the same matter more fully or differently laid.

*Davis v. Yellow Cab Company*, 35 F.R.D. 159, 161 (E.D.Pa.1964) *quoting Blair v. Durham*, 134 F.2d 729, 731 (6th Cir.1943); *see also Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 182 (5th Cir.1980). In holding that leave to amend a Complaint should have been granted by the district court, Judge Mansmann, in *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, stated:

[Defendant] appears fully to have understood the basis for [plaintiff's] complaint from its initial filing. At most, the amended complaint sought ... to 'recast' the original pleading. The amendment, however, neither required additional discovery nor disrupted the district court's schedule.

813 F.2d at 615. Similarly, in the instant case, we find that defendant fully understood the basis for the United States' complaint and that permitting the amendment will neither prejudice the defendant nor disrupt the schedule of this Court. Accordingly, for the reasons stated, this Court shall grant the United States' motion for leave to file the Second Amended Complaint.

### IV. Defendant T & N's Motion to Dismiss

Defendant T & N, in both its Motion to Dismiss the First Amended Complaint as well as in its opposition to the United States' Motion for Leave to File a Second Amended Complaint, argues that none of the five theories of liability identified above, state a claim against T & N upon which relief can be granted. In the interest of efficiency and in order to protect defendant T & N's rights, we shall construe both T & N's motion to dismiss the First Amended Complaint and its opposition to the filing of the Second Amended Complaint, as constituting, pursuant to Federal Rule of Civil Procedure 12(b)(6), a single motion to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted.

■ Federal Rule of Civil Procedure 12(b)(6) provides, in pertinent part:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials pertinent to such a motion by Rule 56.

Because both defendant T & N and the United States have presented voluminous materials outside the pleadings which this Court shall consider in reaching its holding, we are required to convert the motion into one for summary judgment. *Messer v. Virgin Islands*, 623 F.2d 303, 307 (3d Cir. 1980); *Kauffman v. Moss*, 420 F.2d 1270 (3d Cir.), *cert. denied*, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). The parties, in recognition of the aforecited Rule, have presented the pertinent materials and advanced the necessary arguments, without need to provide further notice to the parties, for this Court to treat the motion as one for summary judgment and issue its ruling. *See In re G. & A. Books, Inc.*, 770 F.2d 288 (2d Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

Summary judgment must be entered when the moving party demonstrates to the court that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. In determining whether the movant has met his burden, the Court must inquire "whether the evidence presents a significant disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the moving party meets this burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts" but, rather, must come forward "with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In reaching its ruling, the Court must view the evidence in the light most favorable to the non-moving party, *Lang v. New York Life Insurance Co.*, 721 F.2d 118, 119 (3d Cir. 1983), and accept the non-movant's allegations as true and resolve all conflicts in his favor. *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

■ Based upon a review of all matters presented to this Court, we conclude that genuine issues of material fact exist which preclude the entry of summary judgment. Accordingly, defendant T & N's motion for summary judgment will be denied. This Court notes, however, that despite the fact that the non-jury trial in this matter is scheduled to commence on June 5, 1989, there exists significant confusion as to the legal soundness of the five theories of liability advanced by the United States in the Second Amended Complaint. Accordingly, this Court has chosen, in an attempt to clarify any existing confusion and expedite the scheduled trial of this matter, to resolve a number of the legal issues raised by both the United States and T & N.

### A. *Alter Ego Theory of Liability*

The United States has alleged that because defendant T & N was the alter ego of Keasbey, a corporation potentially liable under CERCLA, the corporate veil between T & N and Keasbey should be pierced. Defendant T & N argues that the doctrine of collateral estoppel bars relitigation of the allegation that T & N was the alter ego of Keasbey. Specifically, T & N alleges that the United States, in *United States v. Johns–Manville*, 237 F.Supp. 885 (E.D.Pa. 1964), litigated and lost the issue of whether T & N was the alter ego of Keasbey. Alternatively, T & N argues that the United States has failed to allege facts sufficient to support its theory of liability that T & N was the alter ego of Keasbey.

In an attempt to clarify the confusion attendant to the doctrine of collateral estoppel, the Third Circuit, in *Gregory v. Chehi*, after first substituting the term "issue preclusion" for "collateral estoppel", held that issue preclusion,

> bars relitigation only of an issue identical to that adjudicated in the prior action.... In issue preclusion cases ... the earlier judgment forecloses only a matter actually litigated and essential to the decision. The first judgment does not prevent re-examination of issues that might have been, but were not, litigated in the earlier action ...

843 F.2d 111, 116 (3d Cir.1988). Thus, in order to bar relitigation of the alter ego issue, the court must find that the following four requirements are met: "(1) the issue sought to be precluded must be the same as involved in the prior action; (2) the issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment." *Matter of Ross*, 602 F.2d 604, 606 (3d Cir.1979) *quoting Haize v. Hanover Insurance Co.*, 536 F.2d 576, 579 (3d Cir. 1976).

■ The party asserting issue preclusion bears the burden of presenting an adequate record to establish the predicates of that doctrine. *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1165–66 (4th Cir.1982); *Hernandez v. City of Los Angeles*, 624 F.2d 935, 937–38 (9th Cir.1980); *Jetro Cash & Carry Enterprises v. Food Distribution Center*, 569 F.Supp. 1404, 1410 (E.D.Pa. 1983). Moreover, the moving party must show that there was no other rational ground upon which the final judgment was based than the issue which it seeks to preclude in the present litigation. *Davis & Cox v. Summa Corporation*, 751 F.2d 1507, 1518–19 (9th Cir.1985).

■ In requesting this Court to pierce T & N's corporate veil, the United States has raised the following issues: whether the corporate formalities separating Keasbey from T & N should be disregarded and whether T & N is liable under CERCLA because of its familiarity with a subsidiary's hazardous waste disposal activities, its capacity to control hazardous waste disposal and releases at the site, and its capacity to abate the damage from such activities. Accordingly, adjudication of the United States' alter ego claims requires this Court to determine, *inter alia*, Keasbey's freedom from domination by T & N, T & N's status under CERCLA, its familiarity with and capacity to control hazardous waste disposal activities and releases at the site, and its capacity to abate the damage from such activities.

Based upon the record, as submitted by T & N, in *United States v. Johns–Man-*

*ville, supra,* we conclude that T & N has not met its burden of proof, under the doctrine of issue preclusion, of showing that the aforementioned issues were actually litigated in a prior action. In *Johns–Manville,* the United States sued Keasbey, Johns–Manville, and Certain–Tweed Products Corporation under sections 1, 2, and 4 of the Sherman Act, alleging a conspiracy to restrain trade and to monopolize the asbestos-cement pipe and couplings industry. 237 F.Supp. at 886. Based upon the evidence of record, the court held, *inter alia,* that the government had failed to prove that Keasbey sold a portion of its assets to Certain–Teed in order to avoid criminal antitrust liability. The court further found that Certain–Teed (not Keasbey) was insufficiently controlled by T & N to sustain the government's theory under the antitrust laws. *Id.* at 892–93. There is no record of actual litigation in or explicit findings by the *Johns–Manville* court regarding either T & N's control over Keasbey or the specific CERCLA issues present in this litigation. Accordingly, the United States is not precluded from litigating the issue of whether T & N is the alter ego of Keasbey.

■ As previously stated, the United States, in the proposed Second Amended Complaint, alleges that T & N is the alter ego of the Keasbey under both a proposed federal rule of decision and Pennsylvania law. While there would likely be no practical effect whether this Court looks to federal law or Pennsylvania law to decide the alter ego issue, we now hold that federal law controls this Court's determination of whether T & N is the alter ego of Keasbey.

It is well established that when a federal statute is silent as to the choice of law to be applied, but overriding federal interests exist, courts should fashion uniform federal rules of decision. *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943). Indeed, under the test set forth in *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) courts are required to create uniform fed-

eral rules of decision when, as here, the nature of the program requires national uniformity, the application of state law would frustrate specific objectives of the federal program, and the application of federal laws would not disrupt commercial relationships predicated on state law. Thus, courts have long recognized the appropriateness of fashioning uniform federal rules of decision to decide corporate alter ego issues under federal statutes. *Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944); *United States v. Pisani,* 646 F.2d 83, 86–88 (3d Cir.1981).

Recently, the Third Circuit, in *Smith Land & Improvement Corporation v. Celotex,* extended this general principle to CERCLA:

> It is not suprising that, as a hastily conceived and briefly debated piece of legislation, CERCLA failed to address many important issues ... The meager legislative history available indicates that Congress expected the courts to develop a federal common law to supplement the statute.

851 F.2d 86, 91 (3d Cir.1988). *See also State of Vermont v. Staco, Inc.,* 684 F.Supp. 822 (D.Vt.1988); *State of Idaho v. Bunker Hill Co.,* 635 F.Supp. 665, 671 (D.Id.1986); *United States v. Chem–Dyne Corporation,* 572 F.Supp. 802, 808 (S.D. Ohio 1983); *United States v. A & F Materials, Inc.,* 578 F.Supp. 1249, 1255–56 (S.D. Ill.1984). Indeed, as one district court stated in *In re Acushnet River & New Bedford Harbor Proceedings:*

> In attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide program. One can hardly imagine a federal program more demanding of national uniformity than environmental protection. Congress did not intend that the ability of the executive to fund the cleanup of hazardous waste sites should depend on the attitudes of the several states toward parent-subsidiary liability in general, or CERCLA in particular. The need for a uniform federal rule is especially great for questions of piercing the corporate veil, since liability under

the statute must not depend on the particular state in which a defendant happens to reside.

675 F.Supp. 22, 31 (D.Mass.1987). *See generally* Note, *Liability of Parent Corporations for Hazardous Waste Cleanup and Damages*, 99 Harv.L.Rev. 986 (1986). As did each of these courts, we conclude that the strong federal interest in uniform enforcement of environmental legislation set forth by Congress; the very real risk that the application of state laws would frustrate the objectives of the federal program; and the fact that a federal law would not disrupt commercial relations predicated on state law, warrants the development of a uniform federal rule applicable to alter ego claims under CERCLA.

There are a sufficient number of federal holdings dealing with alter ego liability that one can decipher a "sort of generalized federal substantive law on disregard of corporate entity." *Seymour v. Hull & Moreland Enginering*, 605 F.2d 1105, 1111 (9th Cir.1979). Because this emerging federal common law draws upon state law for guidance, as previously stated, the choice between state and federal law in many alter ego cases "may in many cases present questions of academic interest, but little practical significance." *In re Acushnet River, supra*, 675 F.Supp. at 33.

The federal common law in this area emerges from the general principle that "the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *American Bell Inc. v. Federation of Telephone Workers*, 736 F.2d 879, 886 (3d Cir. 1984) *quoting Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir.1967); *see also Parker v. Bell Asbestos Mines, Ltd.*, 607 F.Supp. 1397, 1399 (E.D.Pa.1985). Thus, as this Court held, in *Berkowitz v. Allied Stores of Penn–Ohio, Inc.*:

Where the parent and subsidiary have acted jointly or where the subsidiary has acted as an extension of the parent, subject to its knowledge and involvement,

the Court may disregard the parent's separate corporate existence.

541 F.Supp. 1209, 1215 (E.D.Pa.1982); *see generally Publicker Industries v. Roman Ceramics*, 603 F.2d 1065 (3d Cir.1979).

■ Based upon the federal common law regarding alter ego liability, we fashion the following federal rule of decision concerning when the corporate veil can be pierced in a CERCLA case:

Where a subsidiary is or was at the relevant time a member of one of the classes of persons potentially liable under CERCLA; and the parent had a substantial financial or ownership interest in the subsidiary; and the parent corporation controls or at the relevant time controlled the management and operations of the subsidiary, the parent's separate corporate existence may be disregarded.

Such a rule was adopted by the district court in *State of Idaho v. Bunker Hill Co.*, which held that "a parent's involvement in the management and operations" of subsidiary, which was subject to personal jurisdiction as a result, supported the conclusion that the parent "was an owner or operator for purposes of CERCLA liability." 635 F.Supp. at 671.

We note that the United States has pleaded in its Second Amended Complaint that Keasbey formerly owned and operated the Ambler site, that T & N held a majority and then all of Keasbey's stock, that T & N actively participated in the management of Keasbey's operations at the site while asbestos, a hazardous substance, was being disposed of there, that T & N was familiar with Keasbey's waste disposal practices and had the capacity to control the disposal and resultant releases and to abate damages from such releases, and that T & N benefited from Keasbey's waste disposal practices. These allegations, if proven at trial, would meet the criteria of the federal rule of decision adopted by this Court.

## B. *Former Owner and Operator Theory of Liability*

As previously stated, the United States, in the Second Amended Complaint, has alleged three theories under which, it con-

tends, the Court could find defendant T & N directly liable as the former owner and operator of the Ambler site. Defendant T & N challenges each of the three theories on the ground that they fail to constitute a cause of action. While taking no position on whether the United States can meets its burden of proof at trial, this Court does conclude that each of the three theories advanced by the United States may support a cause of action.

### 1. Stockholder and Direct Participant in Management of Ambler Site

■ The United States first alleges that T & N is directly liable as a former owner and operator because it was the sole stockholder of Keasbey and actively participated in its management while asbestos was being disposed of at the Ambler site.

Under CERCLA, the statutory definition of "owner or operator" is, in pertinent part:

(ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility.... *Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.* (emphasis added)

42 U.S.C. § 9601(20)(A). As Judge Newcomer, in *United States v. Anna M. Mirabile, et al.,* held:

Courts have generally concluded that the exemption from liability [found in Section 101(20) of CERCLA, 42 U.S.C. § 9601(20)] gives rise to an inference that an individual *who owns stock in a corporation and who actively participates in its management can be held liable for cleanup costs incurred as a result of improper disposal by the corporation.* (emphasis added)

C.A. No. 84–2280, slip op. at 4–5, 1985 WL 97 (E.D.Pa. Sept. 4, 1985); *see also State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir.1985); *United States v. Northernaire Plating,* 670 F.Supp. 742 (W.D.Mich.1987); *United States v. Ward,* 618 F.Supp. 884 (E.D.N.C.1985); *United States v. Northeastern Pharmaceutical &*

*Chemical Co.,* 579 F.Supp. 823, 849 (W.D. Mo.1984), *aff'd,* 810 F.2d 726 (8th Cir.1986).

In *Kelly v. Arco Industries Corporation,* No. K87–372–CA4 (W.D.Mich. Feb. 9, 1989), agencies of the state of Michigan sued Arco Industries, its controlling stockholder and Board Chairman, and its President, under Section 107(a) of CERCLA, alleging that the individual defendants had the "overall responsibility for the operation and management of the Arco plant." In denying the individual defendants' motion to dismiss, the district court stated:

I believe that plaintiffs' complaint does state a claim upon which relief may be granted. Plaintiffs properly plead that [individual defendants] are liable for response costs under CERCLA as owners and operators of co-defendant Arco. Section 107(a)(1) of CERCLA imposes liability on present owners or operators of facilities. The language of this statute unambiguously makes any person owning or operating a facility releasing hazardous substances liable for the response costs resulting from such releases. Likewise, under section 107(a)(2), any person who owned or operated a facility at the time of disposal is liable for the response costs incurred at the facility.

*Id.* slip op. at 7. There is, of course, no basis, under CERCLA, to distinguish between the liability of an individual stockholder who actively participates in the management of a corporation and a corporate stockholder which so participates. Both individuals and corporations are included within the definition of "person" under Section 101(21) of CERCLA. Accordingly, if an individual stockholder can be liable under CERCLA for his corporation's disposal, a corporation which holds stock in another corporation (e.g., a subsidiary) and actively participates in its management can be held liable for cleanup costs incurred as a result of that corporation's disposal.

### 2. Familiarity with and Capacity to Control Disposal at Ambler Site

■ The United States also alleges that T & N is directly liable as a former owner and operator because T & N was familiar

with Keasbey's waste disposal practices, had the capacity to control both the disposal and resultant release as well as to abate damage from such releases, and benefited from Keasbey's waste disposal practices. Under essentially similar circumstances, the district court, in *State of Idaho v. Bunker Hill Co., supra,* found direct liability against a parent corporation which participated in its subsidiary's management. In so holding, the district court followed the test and reasoning of the court in *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823, 848–49 (W.D.Mo.1984) as follows:

> The statute literally reads that a person who owns interest in a facility and is actively participating in its management can be held liable for the disposal of hazardous waste. Such a construction appears to be supported by the intent of Congress. CERCLA promotes the timely cleanup of inactive waste sites. It was designed to insure, so far as possible, that the parties responsible for the creation of hazardous waste sites be liable for cleaning them up. Congress has determined that the persons who bore the fruits of hazardous waste disposal also bear the costs of cleaning it up.

*State of Idaho v. Bunker Hill Co.,* 635 F.Supp. at 671–672. Thus, if proven at trial, the facts alleged in support of the United States' second theory of liability may entitle the United States to the relief requested.

3. *Holding Indicia of Ownership and Participation in Management of Facility*

■ Finally, the United States alleges that defendant T & N is directly liable as a former owner and operator because it both held a mortgage (an indicia of ownership under Pennsylvania law) on the Ambler site and actively participated in the management of the Ambler facility. As previously stated, under CERCLA, the term "owner and operator" is defined as, in pertinent part:

> (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility.... Such per-

son does not include a person who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.

42 U.S.C. § 9601(20). The United States correctly argues that, for certain limited purposes, under Pennsylvania law, the holding of a mortgage constitutes an indicia of ownership. *See Reconstruction Finance Corporation v. Northern Trust Co.,* 98 F.2d 555, 556 (3d Cir.1938); *Eastgate Enterprises, Inc. v. Bank and Trust Company of Old York Road,* 236 Pa.Super. 503, 345 A.2d 279, 281 (1975); *see generally* H.T. Tiffany, *The Law of Real Property,* § 1380. Should it be determined that T & N's holding of a mortgage on the Ambler site constitutes an indicia of ownership, determination of T & N's liability under CERCLA as an "owner and operator" would depend on its level of participation in the Ambler facility.

Defendant T & N argues that in order to hold a mortgagee liable under CERCLA, the requisite participation in the management of the facility must reach the level of involvement in the day-to-day operational aspects of the facility. Only three courts have considered the issue of the liability of mortgagees under Section 107 of CERCLA. *See United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573, 24 ERC 1193 (D.Md.1986); *United States v. Fleet Factors Corp.,* CV687–070, slip op. at 9–11, 1988 WL 156284 (S.D.Ga.1988); *United States v. Mirabile, supra.* The *Maryland Bank* court did not reach the issue of the extent to which the mortgagee must participate in the management of a facility in order to be held liable as an owner or operator under CERCLA. The issue was reached in *Mirabile,* in which Judge Newcomer held:

> [I]n enacting CERCLA, Congress manifested its intent to impose liability upon those who were responsible for and profited from improper disposal practices. *Thus, it would appear that before a secured creditor such as [a bank] may be held liable, it must, at a minimum, participate in the day-to-day operation-*

*al aspects of the site.* In the instant case, [the bank] merely foreclosed on the property after all operations had ceased and thereafter took prudent and routine steps to secure the property against further depreciation. (emphasis added).

*Id.* at 12. Much the same conclusion was reached by the district court in *United States v. Fleet Factors Corp.:*

> I interpret the phrases "participating in the management of a ... facility" and "primarily to protect his security interest," to permit secured creditors to provide financial assistance and general, and even isolated instances of specific, management advice to its debtors without risking CERCLA liability if the secured creditor does not participate in the day-to-day management of the business or facility either before or after the business ceases operation.

slip op. at 10. Thus, existing case law suggests that a mortgagee can be held liable under CERCLA only if the mortgagee participated in the managerial and operational aspects of the facility in question.

### V. Defendant T & N's Request for Certification for Interlocutory Appeal

 Defendant T & N requested, in the event that this Court denied its motion (which this Court has converted to a motion for summary judgment), that the issues concerning the legal reach of CERCLA liability be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This Court has determined that the issues involved in the motion are not controlling questions of law offering substantial ground for difference of opinion as to the correctness of this Court's opinion and order such that an immediate appeal of that opinion and order would materially advance the ultimate termination of the litigation. *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 754 (3d Cir.) (in banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). Indeed, as previously stated, there exist genuine issues of material fact which can only be resolved at trial. Therefore, T & N's motion for certification for immediate appeal pursuant to 28 U.S.C. § 1292(b) will be denied.

### ORDER

AND NOW, this 10th day of May, 1989, for the reasons set forth in this Court's Memorandum of May 10, 1989,

IT IS ORDERED that plaintiff United States' Motion for Leave to File a Second Amended Complaint is GRANTED and defendant T & N shall, within ten days of service of the Second Amended Complaint, file an Answer; and

IT IS FURTHER ORDERED that defendant T & N's Motion to Dismiss the First Amended Complaint, treated by this Court, pursuant to Fed.R.Civ.P. 12(b), as a Motion for Summary Judgment, is DENIED; and

IT IS FURTHER ORDERED that defendant T & N's Motion for Certification for Immediate Appeal pursuant to 28 U.S.C. § 1292(b) is DENIED.